JUNEAU ACADEMY, Plaintiff-Appellant, *v*. CHICAGO BOARD OF EDUCATION *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 82—2957

Opinion filed March 13, 1984.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Richard C. Clark, Michael A. Nash, and George D. Gardner, of counsel), for appellant.

Brydges, Riseborough, Morris, Franke & Miller, of Chicago (John M. Collins, of counsel), for appellees.

JUSTICE STAMOS delivered the opinion of the court:

Plaintiff Juneau Academy (Juneau), a special education facility, brought suit in the circuit court of Cook County against the Chicago Board of Education (CBE) and the Board of Education of High School District 108 (108) to recover the value of services rendered to students from the defendant school districts. After a bench trial, judgment was entered for defendants. Plaintiff appeals.

Juneau Academy is a residential facility for the treatment of mentally handicapped adolescent boys. It is located in Milwaukee, Wisconsin. The instant dispute arises from the placement with Juneau in late 1979 of five high school students from CBE and one from 108. Juneau, unfamiliar with Illinois procedures for the payment of tuition to private facilities for handicapped students, accepted the Illinois students into its program before it had received approval from Illinois for its rate structure. Without such approval, Juneau was ineligible under Illinois law to receive tuition payments from Illinois school boards.

The student from 108 was referred to Juneau by Michael Schack, the administrator of the Institute for Motivational Development. Schack sent a letter of referral on November 11, 1979, to Thomas O'Brien, the assistant director of Juneau. Upon receiving the letter, O'Brien set out to determine the student's eligibility for admission to Juneau. Schack also contacted Alex Grandt, a supervisor of special education for 108, to inform him that the student was in need of residential treatment. Schack was not an agent of either Juneau or 108. The decision to place the student in a residential facility was made by 108 on December 7, 1979, with Grandt's knowledge. Juneau accepted the student on December 26, 1979, without 108's knowledge.

On January 8, 1980, Grandt wrote to O'Brien, asking that the student be considered for placement with Juneau. Upon receiving this letter, O'Brien telephoned Grandt and informed him that the student had been at Juneau since December 26. Grandt expressed satisfaction that a placement had been accomplished, but said Juneau had moved faster than he had anticipated. O'Brien informed Grandt that Juneau would soon be approved for Illinois funds, and Grandt stated that 108 would discuss payment of the tuition once approval was obtained. At this time, however, Juneau had applied only for approval of its program. It was not aware that approval of its rates by the Illinois Governor's Purchased Care Review Board was also required. Because of this misunderstanding, Juneau was not able to obtain complete approval until July 28, 1980. When the 108 student's treatment was completed in August, Juneau contacted 108 to arrange for payment of

the tuition, which at that time exceeded $2,000 per month. 108 refused to pay for any treatment provided prior to Juneau's approval for Illinois funds. Juneau then filed suit, seeking recovery in contract.

The trial court found that the facts were not sufficient to prove the existence of an express or implied contract between Juneau and 108. The court found that 108 had not agreed to assume responsibility for the tuition for services provided prior to Juneau's Illinois approval.

Five students from CBE were also placed with Juneau in late 1979 and early 1980, under circumstances similar to those of the student from 108. However, the trial court found that an agreement implied in fact existed between Juneau and CBE for the period of treatment prior to Juneau's approval in Illinois. This finding was based on a statement made by James Clemons, a social worker employed by CBE, that once Juneau was approved, CBE would pay tuition retroactively to the dates of the students' placements.

The trial court went on, however, to hold that CBE was without authority to enter into such an agreement. The court cited section 14—7.02 of the School Code (Ill. Rev. Stat. 1981, ch. 122, par. 14—7.02), which had been interpreted by the supreme court in *In re Claudia K.* (1982), 91 Ill. 2d 469, 440 N.E.2d 78, as prohibiting the placement by school districts of students in nonpublic facilities which have not been approved by the Governor's Purchased Care Review Board. Because CBE was without authority to place the students with Juneau, the court held, the contract was *ultra vires* and void. See *Stahelin v. Board of Education* (1967), 87 Ill. App. 2d 28, 41, 230 N.E.2d 465.

Juneau first contends that the trial court erred in holding that section 14—7.02 of the School Code prohibited CBE from placing students with Juneau prior to Juneau's approval in Illinois. Juneau argues that the trial court incorrectly interpreted the supreme court's decision in *Claudia K.* The trial court found that section 14—7.02 of the School Code, as construed in *Claudia K.*, prohibited the placement of students in certain nonapproved private institutions.

In *Claudia K.*, the appellee argued that section 14—7.02 did not forbid placement in a nonapproved institution, but provided only that such placement would not entitle the school district to reimbursement from the State. The supreme court stated:

> "Under section 14—7.02 of the School Code (Ill. Rev. Stat. 1979, ch. 122, par. 14—7.02) a district is authorized to place children in out-of-State and private special education facilities, under certain restrictions, and reimbursement of the district

for certain expenses is provided. The first sentence of the second paragraph of this section states: 'No child shall be placed in a special education program pursuant to this Section if the tuition cost for special education and related services increased more than 10 percent over the tuition cost for the previous year or exceeds $4,500 per year unless such costs have been approved by the Governor's Purchased Care Review Board.' (Ill. Rev. Stat. 1979, ch. 122, par. 14—7.02.) Even if, however, this sentence could be construed as authorizing placement in a nonapproved institution while only denying reimbursement, a regulation governing District conduct in this area leaves no doubt as to the absence of placement authority:

'No nonpublic facility shall be utilized by a district until: (1) The facility is approved by the SBE, (2) Costs have been established for it by the Governor's Purchased Care Review Board, (3) Proposed residential placements are reviewed and approved by the Illinois State Board of Education prior to placement ***.' Adopted Amendments to the Rules and Regulations for Approval of Non-public Facilities Educating Handicapped Students under section 14—7.02 of the School Code, 5 Ill. Reg. 4577 (April 24, 1981).

Clearly the District had no authority to place Claudia in Ridgeway, which was unapproved." *In re Claudia K.* (1982), 91 Ill. 2d 469, 478-79.

Juneau argues that the supreme court's opinion was based not upon section 14—7.02, but upon the regulation quoted above. Because this regulation did not become effective until after Juneau obtained approval for Illinois finding, Juneau contends, the decision in *Claudia K.* cannot be used to void Juneau's contract with CBE.

■ We find this contention to be without merit. The statute on its face clearly prohibits the placement of Illinois students in a nonapproved institution such as Juneau, and while the language of *Claudia K.* is somewhat ambiguous, it is at least clear, as the trial court noted, that the supreme court did not rely solely upon the regulation. Rather, it appears that the court used the regulation as an aid in construing the statute and that the statute was actually the basis for the decision. We therefore find no error in the trial court's holding that section 14—7.02 of the School Code rendered Juneau's agreement with CBE void.

Juneau also contends that, under Federal law, CBE has a duty to provide handicapped children with a free education, and that therefore, section 14—7.02 of the School Code cannot be construed to pro-

hibit CBE from contracting with Juneau. See 20 U.S.C. sec. 1412(1) (1982).

■ A private education facility such as Juneau lacks standing to assert the rights of handicapped children to a free education. (See *Nelson v. Tuscarora Intermediate Unit No. 11* (1983), ___ Pa. ___, ___, 457 A.2d 1260, 1263-64, *cert. denied* (1983), 464 U.S. 866, 78 L. Ed. 2d 172, 104 S. Ct. 196.) Juneau therefore cannot rely on the students' rights under Federal law to advance its contract claim.

■ Juneau next contends that the trial court erred in finding that no contract existed between Juneau and 108. Juneau argues that the finding of no contract implied in fact was error, and alternatively that the court should have allowed Juneau to recover in quasi-contract.

A contract implied in fact arises by a promissory expression which may be inferred from facts and circumstances which show an intent to be bound. (*Gary-Wheaton Bank v. Burt* (1982), 104 Ill. App. 3d 767, 775, 433 N.E.2d 315; *Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 873, 400 N.E.2d 614; *Frey v. Belleville News-Democrat, Inc.* (1978), 64 Ill. App. 3d 495, 498, 381 N.E.2d 705.) The trial judge in the instant case made specific findings of fact which are included in the record. These findings are supported by the evidence, and the facts do not support a conclusion that a contract between Juneau and 108 can be implied in fact. The record shows that the 108 student was placed with Juneau in December 1979, without 108's knowledge. Two weeks later, when O'Brien learned that 108 hadn't been informed of the placement, he telephoned Grandt and told him that the student was already at Juneau. Grandt asked whether Juneau was approved for Illinois funding, and O'Brien told him that it was not, but that approval was forthcoming. Grandt then stated that 108 would discuss payment of the tuition once Juneau obtained approval for Illinois funds. Juneau subsequently discovered that the approval process was more involved than had been anticipated, and full approval was not in fact obtained until July 28, 1980.

When the student's treatment was completed in August 1980, Juneau contacted 108 and sought payment of the tuition. 108 agreed to pay tuition costs incurred after July 28, but refused to pay for any treatment provided prior to Juneau's Illinois approval.

The record reveals that, during the eight-month period of the 108 student's treatment, Juneau was becoming more aware, through its dealings with other Illinois boards of education, that it could not expect payment from Illinois school districts unless it obtained approval for Illinois funding. Indeed, Juneau was most likely made aware of

this fact by Grandt's comment in January 1980 that 108 would discuss payment only after Juneau obtained approval. During the seven months in which Juneau provided treatment to the 108 student while it was not approved, no attempt was made by Juneau to determine whether 108 was aware of the situation or whether it intended to pay the tuition for treatment provided during the delay in approval.

It is clear that Juneau knew during this time that 108 could not pay tuition to a nonapproved facility. Because Juneau believed in January that its approval was imminent, it agreed to wait until approval was obtained before billing 108. When Juneau learned that approval would be delayed, it apparently decided not to inform its Illinois customers of this, in hopes that rate approval would be granted quickly by the Governor's Purchased Care Review Board. Unfortunately, approval was not obtained until the 108 student's treatment was nearly complete, so that 108 found that the treatment of one of its students had been completed at a nonapproved facility.

These facts do not establish the existence of an agreement implied in fact between Juneau and 108 for the payment of tuition for treatment provided prior to July 28, 1980, Juneau knew from the outset that approval was necessary before it could receive Illinois funds, yet when Juneau discovered that its approval would take longer than it had initially expected, it made no attempt to determine 108's position as to liability for tuition costs incurred during the delay. Consequently, 108 was aware only of what it had learned from its initial contact with Juneau in January; that Juneau was not yet approved but was expecting approval soon and would contact 108 regarding payment once the approval process was completed. Juneau knew that 108 could not pay tuition to a nonapproved facility and 108 believed that Juneau's approval process would be completed immediately. The record contains no facts which suggest that 108 intended to pay tuition to a nonapproved facility. Rather, the evidence shows just the opposite; that 108 believed Juneau would be approved during most of the course of the 108 student's treatment. We therefore find the trial court's finding of no contract implied in fact between Juneau and 108 to be supported by the evidence.

■ Juneau also contends that the evidence supports a finding that it should be permitted to recover in quasi-contract. However, the law will not imply an agreement which would be illegal if it were express. (See *Board of Education v. Murphy* (1978), 56 Ill. App. 3d 981, 985, 372 N.E.2d 899.) We have already held that Illinois law prohibits the placement of students in nonapproved private facilities such as Juneau. Therefore, the law will not imply a contract for the placement

with Juneau of a 108 student prior to Juneau's approval in Illinois.

We find that the trial court correctly held that no implied agreement existed between Juneau and 108.

The decision of the circuit court is affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.