THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
KATHLEEN CAROL BOYT, Defendant-Appellee.

Second District   No. 2—83—1007

Opinion filed October 15, 1984.—Rehearing denied November 26, 1984.

2

REINHARD, J., specially concurring.

Robert Morrow, State's Attorney, of Geneva (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

G. Joseph Weller and Robert S. Hirschhorn, both of State Appellate Defender's Office, of Elgin, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

This is an interlocutory appeal by the State from the judgment of the circuit court of Kane County dismissing two armed robbery indictments against the defendant, Kathleen Carol Boyt. (Ill. Rev. Stat. 1983, ch. 38, par. 18—2.) We have taken with the case the defendant's motion to dismiss the appeal, the State's objections thereto, and the defendant's motion for leave to respond to the State's objections.

The judgment dismissing the indictments was entered on defendant's motion to enforce the terms of a plea agreement in which the defendant offered to testify against her codefendant, Johnny Banks, in exchange for a reduction of the charges against her to permit county jail time, placement in a residential drug treatment program, and probation. Banks pleaded out, however, to two robbery convictions after the fact of defendant's offer to testify against him at trial was communicated to him, and after identification motions in connection with "a series of armed robberies" were denied, and identifications of Banks by eyewitnesses of the robberies were allowed. Banks received a seven-year sentence for his convictions.

Thereafter, the State would not agree to proceed according to the above-noted terms of the plea agreement with the defendant but, rather, offered her a three-year sentence instead. The State's position was that it actually had not agreed to the terms of the defendant's offer and, further, since Banks had pleaded out, there was no need for her testimony against him.

On November 3, 1983, the circuit court of Kane County found that a plea agreement had been reached, and ordered the State to

specifically perform on the terms of the agreement. In pertinent part, the following colloquy occurred:

"MS. BRAWKA [Defense Counsel]: Judge, my client will stand ready to enter the plea pursuant to the terms of the negotiated disposition at any time the Court is available to do so.

MR. BARSANTI [Assistant State's Attorney]: Your Honor, I have talked this over with our appellate prosecutors. What we want to do, Judge, is we're going to refuse to enter into the agreement and I think the remedy as laid out in the other cases is for the Court to dismiss the charge and—because we're going to file a Notice to Appeal.

I think we have to file it within ten days from today.

THE COURT: What about contempt? Don't I have the contempt powers? I can put someone in jail, either you or whoever [sic] is telling you not to abide by my ruling.

\* \* \*

MS. BRAWKA: Respectfully, I don't think that's the appropriate remedy.

THE COURT: I understand.

MS. BRAWKA: I talked to the State Appellate Defender's Office and they indicated under the current case law the Court does not have the power to reduce charges to accept reduced pleas. And if the State refuses to comply with the order, then under the inherent power of the Court to dismiss because of due process violations the Court is authorized to dismiss the charges and then the State can take an appeal from that order.

THE COURT: Are you saying Mr. Barsanti, that you're refusing to proceed?

MR. BARSANTI: Right.

THE COURT: Then in that case the charges against Kathleen Boyt in General Number 83 CF 480 and 83 CF 481 will be dismissed."

Immediately thereafter, however, the assistant State's Attorney asked the court to allow the State several days' time in which to decide whether it would comply with the agreement or not; the court vacated its dismissal order, and entered an order granting the defendant's motion to enforce the plea agreement. On November 7, the first assistant State's Attorney, Thomas Sullivan, appeared and, in pertinent part, the following colloquy occurred:

"MR. SULLIVAN: \*\*\* The Court made a ruling that essentially that the plea agreement that the—that the Court essentially was ordering the enforcement of a plea agreement which

the Court found to have—having taken place between the State of Illinois and the Defendant in this case.

The State, given its position, declined to enter into the plea agreement and pursuant to I believe Chapter 38, Section 114 of the Criminal Code, the Court has dismissed the indictment based upon its inherent authority as it perceives it under that Chapter and Section.

MS. BRAWKA: I think that what had happened the way we left it Friday is that Mr. Barsanti said the State was going to make the decision on whether or not they would go into specific performance.

THE COURT: I dismissed them on Thursday and they said they'd like more time to think about it, so I vacated essentially the order dismissing the two cases.

The State has declined to go through with the plea agreement and, therefore, I'm going to dismiss 83 CF 480 and 83 CF 481.

MS. BRAWKA: Judge, also to correct it, I think last week I presented to the Court the case of *People Vs. Lawson,* which was an Illinois Supreme Court case found at 67 Ill. 2d 449 from 1977 which states that the Court has inherent powers under due process to dismiss cases.

And since part of the Court's ruling had been on a due process basis in terms of the specific performance order, I would ask the Court to make the ruling of dismissal under that since that isn't under a specific statutory section in the statute.

THE COURT: All right.

MR. SULLIVAN: So then it would be the Court's ruling based upon due process and the Court's inherent authority that the charges would be dismissed?

THE COURT: That's correct.

\* \* \*

THE COURT: And the unfairness of the State's position."

The defendant construes the dismissals below as having been entered on the State's "election" to dismiss; consequently, defendant asserts the ruling is not adverse to the State and it is not entitled to appeal. Defendant cites in support *People v. Meek* (1981), 92 Ill. App. 3d 1129 and *People v. Maher* (1979), 77 Ill. App. 3d 488.

In its objections to the defendant's motion to dismiss, the State points out the assistant State's Attorney expressed his willingness to be jailed as a contemnor rather than follow the court's order that the charge be reduced, and that defense counsel herself suggested to the

court that it was powerless to reduce the charge itself and accept a plea to such reduced charges, but noted that the court could dismiss the charges on due process grounds and that the State could then appeal. It is manifest, argues the State, that the dismissal was not one voluntarily sought by it, and urges this court to deny defendant's motion to dismiss.

Defendant responds she did not term the State's motion to dismiss the charges "voluntary," rather, that the State "elected" to dismiss the charges rather than accept the guilty pleas under the negotiated agreement. Defendant argues the genesis of the lower court's dismissal was from the State, and that the issue is to whom the dismissal may validly be imputed.

In its reply brief on appeal, the State points out another reason to deny the defendant's motion to dismiss the appeal is because her position on this issue is directly contrary to that taken by her in the circuit court, where she expressed her belief that a jail sentence for contempt was not the appropriate remedy. The State feels this factor distinguishes the instant appeal from that in *People v. Meek* (1981), 92 Ill. App. 3d 1129, in that the dismissal here was not entered on its motion, nor was the dismissal here essentially a *nolle prosequi* as was the case in *People v. Maher* (1979), 77 Ill. App. 3d 488. Additionally, the only "election" which was to be made by it at the November 7 hearing was whether or not it would comply with the terms of the agreement. It elected not to comply with the terms, and the court once again—as it had previously on November 3—dismissed the charges against the defendant. The State asserts the instant appeal is the only means available to it to test the validity of the court's order enforcing the terms of the agreement.

■ We agree with the State that the instant appeal is proper under Supreme Court Rule 604(a)(1) (87 Ill. 2d R. 604(a)(1)). That rule provides in pertinent part:

"(a) Appeals by the State.

(1) *When State May Appeal.* In criminal cases the State may appeal only from an order or judgment the substantive effect of which results in dismissing a charge for any of the grounds enumerated in section 114—1 of the Code of Criminal Procedure of 1963; arresting judgment because of a defective indictment, information or complaint; quashing an arrest or search warrant; or suppressing evidence."

This rule has been interpreted to allow the State to appeal from any judgment which has the substantive effect of a dismissal even if the ground for such dismissal is not contained in section 114—1. (*Peo-*

*ple v. Lawson* (1977), 67 Ill. 2d 449; *People v. Verstat* (1983), 112 Ill. App. 3d 90; *People v. Oswald* (1982), 106 Ill. App. 3d 645.) Where there has been an unequivocally clear denial of due process, the trial court has the inherent authority to dismiss. (67 Ill. 2d 449, 456.) Additionally, it is well established that a court has the inherent power to enforce its orders by way of contempt. (*In re G.B.* (1981), 88 Ill. 2d 36, *cert. denied* (1982), 456 U.S. 963, 72 L. Ed 2d 487, 102 S. Ct. 2041.) Because this power is inherent, the power to punish for contempt does not depend on constitutional or legislative grant (*In re G.B.* (1981), 88 Ill. 2d 36, 40), and the court is not strictly bound by the provisions of the Civil Practice Act (now denominated the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 1—101 *et seq.*)), or the Code of Criminal Procedure of 1963, and may exercise discretion in fashioning appropriate remedies to a party's contumacious behavior. *47th & State Currency Exchange, Inc. v. B. Coleman Corp.* (1977), 56 Ill. App. 3d 229, 234.

We agree with the State that this case is inapposite to both *People v. Meek* (1981), 92 Ill. App. 3d 1129, and *People v. Maher* (1979), 77 Ill. App. 3d 488. In *Meek,* the court determined the State could not appeal the dismissal of the indictment with prejudice because the dismissal was granted on the State's own motion made in order to avoid proceeding to trial after the court denied its motion to dismiss without prejudice. In *Maher,* in determining the timeliness of an appeal by the State, the court observed that the first dismissal order entered by the court could not have been appealed by the State, since it was not an order adverse to it as contemplated by Supreme Court Rule 604 (87 Ill. 2d R. 604) because it was in effect only a formalization of the State's entry of a *nolle prosequi* to the charge, and not a dismissal on the merits.

Although the assistant State's Attorney here was the first to suggest dismissal, it is clear the suggestion was offered only as an alternative sanction to imposition of a fine or imprisonment for its noncompliance with the court's order of enforcement of the plea agreement and, in fact, defense counsel herself noted that imprisonment for refusing to comply with the terms of the plea agreement was not "the appropriate remedy," but that the court could dismiss on due process grounds and the State could then appeal. Clearly, then, the dismissal was meant to be a sanction against the State for its refusal to proceed with the terms of the previously negotiated plea agreement as ordered by the court. As such, it was "adverse" to the State and is appealable. Accordingly, the defendant's motion to dismiss the State's appeal is denied.

On the merits, this appeal presents the question whether the court's judgment that there was a plea agreement between the defendant and the State was against the manifest weight of the evidence, and whether the State's repudiation of the agreement constituted a violation of due process.

The sequence of events culminating with the court's order dismissing the indictments against the defendant was described during the October 4, 1983, hearing on the defendant's "Motion to Enforce Terms of Negotiated Plea." It was agreed at the outset of the hearing that defense counsel and the assistant State's Attorney would testify in narrative form and the judge would ask questions if desired. Defense counsel related that the defendant had been evaluated by TASC. (Treatment Alternative to Street Crimes, Inc.—a drug abuse rehabilitation program) as a drug addict, but was determined to be ineligible for its program due to the nature of the charges against her. She continued, stating:

"From June to July, the case had been continued several times. A few continuances were marked for receipt of police reports from South Elgin.

It is a continuance that was marked, some on Defendant's motions and during that time period, I had indicated to Mr. Barsanti that we would be seeking a prepose [sic] disposition for a drug program for her.

And I tried to make him, if I was aware, of the facts, make him aware also.

I did not receive the diagnostic evaluation until July 28. And on the court date of July 19, I had asked for a continuation to the beginning of August to receive that, and it is reflected in the court file that that continuance was on my motion alone.

I received the diagnostic evaluation on July 28, and on August 3rd, I spoke to Mr. Barsanti in the conference room that is in back of the two courtrooms where felony cases are held, an attorney's conference room.

I gave him a copy of that diagnostic evaluation to read, and explained to him again, what the terms we were looking for on that negotiation, what they were, and what Ms. Voight [sic] would be willing to do, which would be to testify as to what she did that evening or any other evening with Johnny Banks in terms of dropping him off, driving him around, the fact that—and all the other facts that go with that, where she took him, how long he was gone, what he came back with or without.

I explained to him what we were willing to do. What we

were looking for. After explaining that, going over her back-ground again, and speaking with him and also telling him that I had spoken to the Elgin Police Department, Detective Strick-land who had indicated to me that the Elgin Police Department had no complaint with the disposition for a drug program, and some type of county jail time, Mr. Barsanti indicated that it sounded good to him.

But that he would not, and I asked why he—can we do this then, and he told me that I don't—he didn't want to do any-thing with Banks' case still pending because [if] I [Barsanti] give this woman this deal, and then I need her testimony later, as she already has the deal, wants [sic, presumably 'what's'] to make her testify against Banks at trial(?).

And I [Barsanti] can't risk her losing the story. And I stated that was reasonable.

I am going on vacation anyway, I know there was [sic] mo-tions on Johnny Banks coming up in the interim [sic]. And I said maybe something, you can have something more definite or set a trial date and we will see what happens when I get back, when I get back on August 22nd.

I spoke to Mr. Barsanti in his office in the States Attorney's office, and he indicated to me, I asked him if we were going to plead out Kathleen Boyt the next court date which was the next day, the 23rd, since Johnny Banks, during that two weeks had pleaded out on his case, and he got sentenced to seven years on a plead [sic] agreement.

And he indicated, he asked me did we have a plea offer or a plea bargain[?] In negotiated—negotiations, I told him I thought that we had since I had informed my client of that, had written him [sic] a letter at the jail saying to him [sic] that Johnny Banks' case, will be taken care of.

And at that point he asked me, gone [sic] over the terms again, and I told him what I understood them to be.

Six months in the county jail, a residential drug program and probation on a charge of robbery or two charges of rob-bery, it doesn't matter, just some type of reduction from class X.

He indicated to me that he would have to double check that with his bosses and then the next day or thereafter he in-formed that they did not wish to go along with that, with that offer, if the offer had been three years, I asked for an opportu-nity to speak to Messers. [sic] Morrow and Sullivan and tell

them there was a plea offer made and accepted already and I told them, I showed them copies of the diagnostic evaluation and asked them to reconsider which they reconsidered, but still felt that they would not go along with any type of disposition involving probation.

And, hence, the filing of the motion to enforce the terms of the negotiations. At the time of the conversation that I had with Mr. Barsanti, on August 3rd, I felt that there had been an offer made and I had indicated to him, I had a standing permission from my client to go for that disposition.

I had felt that it had been accepted.

Which is part of the reason that the case has been continued from the 3rd to the 23rd without any other action. One other stipulation I think that Mr. Barsanti would agree to would be that between August 3rd and August 22nd, he had conversations with Van Larson who was the attorney representing Johnny Banks, and he informed Mr. Barsanti, informed Van Larson that if the case were to go to trial, that the State would use Kathleen Voight's [sic] testimony. Is that true?

MR. BARSANTI: Yes.

MS. BRAWKA: All right. And he is indicating yes, that is true.

I think that's the extent of my narrative."

The assistant State's Attorney then related his recollection of the events:

"Maybe I could cut it down. Everything what she says, has spoken of, as I recall some of it, some of it I don't recall exactly.

I recall the diagnostic report. I recall seeing that, and I would recall her talking about that.

I also recall having a conversation with Ms. Brawka.

Now, I can't remember the date, but in my mind, what I recall, it was on a date that I was having with Johnny Banks' hearing. If it is correct, and the way I recall it is that we have [sic] just about to gone [sic] into court with Mr. Larson, the way I recall the conversation, she told me, she made a pitch to me along the line of what she said, and my response to her was, we probably could do something like that.

In my mind, there had not been an agreement made at that particular point in time. In our office, it is common procedure before we flip anybody to use the jargon, but to use somebody—to another Defendant has to be proved—but Mr. Sullivan

or Mr. Morrow which is the way it has always been, done—we have—and which is done now, I said we probably could do something like that without coming to making an offer or an acceptance about an agreement.

And it also had to do with the fact she was going to testify. That was my understanding.

I went and told Mr. Larson upon discussing this with him, that we had her testimony, if needed.

I did not tell him there was a deal, and Mr. Larson will testify that he could not testify. I—I had an agreement with Ms. Brawka, and my indication to Mr. Larson was that if we were going to have this trial we would have an offer from Ms. Boyt that she would become [sic] in here to testify for the State, and what is—and that is the statement.

THE COURT: That was before any deal was made with Johnny Banks?

MR. BARSANTI: Right. Then we went through, that was before we went through a series of identification motions before this court which Judge—Judge Schnake then denied. At that point, I ended—there are a series of armed robberies which had all the identification motions were [sic] denied and the identifications were allowed. Allowed of the Defendant by eye witnesses of the robberies.

At that point Mr. Larson then agreed to two armed robberies or two robberies, two robbery convictions I think. Whatever, it was—but he ended up doing a term of seven years in prison on his convictions.

Ms. Brawka, I am sure, would agree that this was the first—she first came back to me after Mr. Banks pled out and said we have a plea agreement. I had voiced surprise that we had an agreement.

She told me what the pitch was, she made at that particular time.

I went back and took that back to Mr. Morrow and that was refused.

Your Honor, I think the whole first—first of all the whole—of all of the things here, I don't believe that was an offer or an acceptance. It was a very informal discussion concerning the agreement.

Now, Your Honor, if that is the type of thing that will be considered by this court to be an agreement, well, I am getting into arguments which I don't want to do now, but that is basi-

cally the facts, Your Honor.

And she never did testify for the State, and we never, in my mind never made a firm agreement. That is it."

The case was then continued for submission of memoranda, and the court ruled on November 3, 1983, that the defendant's motion be granted. He noted:

"It's my feeling that the offer was made by the defense attorney. The Assistant State's Attorney said it sounds good to me. On the basis of that the defense attorney told her client it had been accepted.

But more than that the Assistant State's Attorney acted upon the proposed plea and continued her case till after the case against the co-defendant Johnnie Banks' whose case was disposed of. And further that the State's Attorney informed the attorney for Johnnie Banks, one Van Larson, that Kathleen Boyt was going to testify against Johnnie Banks which solidified the case against Johnnie Banks and induced him into entering a plea in his case.

Then when it was discovered that they no longer needed the testimony of Kathleen Boyt the—there was an attempt to change the terms of the plea agreement.

And I feel that the plea agreement was accepted and as they set out in the case of *Santobello Vs. New York*, 404 U.S. 257, United States Supreme Court, the Supreme Court acknowledged the importance and necessity of plea bargaining and concluded the sentence by saying—found it underlying the principle of fairness.

I think that's the key in this case. The principle of fairness. Since they used Kathleen Boyt they should not then be allowed to change the plea, the plea negotiations."

■■ The State argues the points relied upon by the court in making its decision do not support the finding that a plea agreement had been reached, and that at most, the record shows the prosecutor's response to the defendant's offer was a counter offer for a unilateral contract which could be accepted only by defendant's actual performance of testifying against Banks.

In particular, the State argues it should not be estopped from claiming there was no agreement simply because Banks pleaded guilty after it communicated to his attorney the fact the defendant offered to testify against him. It asserts such a practice would amount to providing a vehicle whereby any defendant, by offering something of benefit and asking for reduced charges in return, could in effect override

the power of prosecutorial discretion which is meant to be vested solely in the executive branch of the government. *Cf. People ex rel. Daley v. Moran* (1983), 94 Ill. 2d 41 (the State's Attorney, as a member of the executive branch of government, is vested with exclusive discretion in the initiation and management of a criminal prosecution, and a trial judge cannot assume the rule of prosecutor and determine which criminal offense shall be charged, and thereafter proceed with disposition of that offense over the State's objection).

The State also contends continuance of the defendant's case from August 3 to August 23 should not operate to estop it from disclaiming the existence of an agreement. The record clearly shows the alleged agreement was only "in part" the reason for the continuance, the other reason being that defense counsel, in her own words, was "going on vacation anyway." Lastly, the State points out the prosecutor's comment "sounds good to me" cannot be construed as the acceptance necessary to form a contract, since the comment must be construed in light of his further response that he would not "do anything with Banks' case still pending." The State posits that the prosecutor's further comments about defendant's failing to perform if he gave her the deal indicates that he was making the defendant a counter offer whereby he would agree to the terms only after she actually testified against Banks.

In sum, the State contends the record shows it did not accept the defendant's offer, nor did the defendant accept its counter offer to perform first by testifying. Thus, no agreement had been reached and the court's order that it comply with the terms of the agreement was based on a finding of fact which is unsupported by the record.

Defendant responds to the contrary that it is abundantly clear the parties reached an agreement and that the State began to reap the benefits thereof while denying the defendant the benefit of her bargain. She contends the clearest indicia of the existence of the plea agreement was the prosecutor's use of her willingness to testify against Banks. She points out the offer clearly was conditioned upon the State's assent to the specific terms thereof. Consequently, the prosecutor could not have told Banks' attorney—at least not truthfully—that she would testify against him unless she had either been granted immunity, waived her right against self-incrimination, or there was, in fact, assent to the conditions specified by her in return for her testimony. She points out the record reflects nothing about a grant of immunity, and certainly her conditional offer to testify negatives any finding of an unconditional waiver of her fifth amendment right against self-incrimination. Defendant notes here that the prac-

tice of calling a codefendant as a witness where the codefendant has already refused to testify has been condemned because it compels the witness to invoke the privilege against self-incrimination and operates to prejudice the defendant in the eyes of the jury. *People v. Myers* (1966), 35 Ill. 2d 311, 334, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752.

Defendant disputes the State's contention the continuance was occasioned either by her absence during the August 3 negotiations or by her attorney's vacation plans. She points out her presence in court could easily have been accomplished had the State agreed to entry of the plea at that time and, further, although her counsel's vacation may explain the length of the continuance, the reason for the continuance was nevertheless attributable to the State's refusal to allow her to plead out on that date. Defendant denies the State's comments expressing its unwillingness to "do anything with Banks' case pending" amount to a counter offer of a unilateral contract. She contends the prosecutor's comments were too ambiguous to amount to such a counter offer and that ambiguity must be resolved against the party choosing the terms. Alternatively, defendant points out her continued willingness to testify against Banks amounts to an acceptance of the counter offer and the fact her performance was obviated by Banks' guilty plea is a change in circumstance which is chargeable to the State because it induced Banks' plea. She asserts affirmance of the court's judgment here would be no threat to the prosecutorial discretion of the State's Attorney because the prosecutor need only reject any defendant's offer which it finds undesirable. To the contrary, she argues that reversal under the circumstances presented by this case would seriously undermine the viability of the plea negotiation process without which prosecution resources would have to be multiplied several-fold. In sum, she asserts the court's finding there was an agreement is supported by the facts in the record and should be affirmed.

The State replies that although defendant's actual testimony against Banks would have been conditioned on the terms of her proposal, it contends her mere offer to testify was not similarly conditioned and was, in fact, not solicited by the prosecutor but, instead, freely proposed by her. The only thing the prosecutor conveyed to Banks' attorney was the fact that the defendant was willing to testify against Banks. The State concedes that although the validity of Banks' plea might be in doubt if the prosecutor had lied about the defendant's willingness to testify against him, it asserts the defendant would have no standing whatever in any challenge to such a plea, and urges that her argument in this regard not be considered as any sup-

port for her position that there was an agreement.

Having reviewed the record before us, we conclude the court's finding that a plea bargain agreement had been reached between the defendant and the State is supported by the evidence.

Despite the fact plea negotiations exist within the criminal justice structure, they are governed by contract law principles. (*People v. Davis* (1981), 94 Ill. App. 3d 809.) "A plea agreement results where the prosecutor and the accused exchange promises to do or refrain from doing certain acts. The test of the breach of such an agreement is an objective one. Motives and justification of the parties are largely irrelevant under such a theory." (94 Ill. App. 3d 809, 811.) Whether an oral contract exists, the terms, conditions and the intent of the parties are all questions of fact to be determined by the trier of fact (*Hodgman, Inc. v. Feld* (1983), 113 Ill. App. 3d 423), and the court's determination should not be reversed unless it is contrary to the manifest weight of the evidence. *Howard A. Koop & Associates v. KPK Corp.* (1983), 119 Ill. App. 3d 391.

The record here shows defendant's counsel presented the terms of her client's offer to the prosecutor and he "indicated that it sounded good to him." The prosecutor testified his response to her offer was, "[W]e probably could do something like that." The State concedes the prosecutor's response considered alone and objectively appears to constitute acceptance sufficient to form a contract. However, it seeks to avoid the finding that an agreement had been reached by reference to the prosecutor's further statements expressing his unwillingness to allow her to enter the plea that day due to his concern she would lose her motivation to testify after getting the deal.

We perceive the prosecutor's refusal to proceed immediately with statutory formalization of the agreement by presenting the terms to the court in compliance with Supreme Court Rule 402 (87 Ill. 2d R. 402)—much like the act of reducing the terms of an oral contract to writing—does not defeat the fact that the parties had reached an agreement which, in effect, "sounded good" to both of them. There was a meeting of the minds as to what each must do in order to attain that which each desired.

As noted above, where there is uncertainty as to an agreement, the conduct of the parties is revealing as to their intent or understanding of the agreement. Here, after the discussion, defense counsel wrote her client that the terms proposed had been accepted, and explained that her case had to be continued to run along with the Johnny Banks' files. The prosecutor meanwhile proceeded on his way to hearings on the Banks' identification motions and—in his own

words—he informed Banks' attorney that "[w]e had her [Boyt's] testimony, if needed." Although it has been suggested in argument that such a representation could have been made to Banks' attorney even if such were not the case, this court will not construe such a statement made by an officer of the court to be an intentional misrepresentation. The law implies in every contract a promise of good faith and fair dealing. (*Dykstra v. Crestwood Bank* (1983), 117 Ill. App. 3d 821; *Cuerton v. Abbott Laboratories, Inc.* (1982), 111 Ill. App. 3d 261.) The prosecutor could not in good faith have made that representation to Banks' attorney unless he had presently assented to the terms proposed by the defendant. The prosecutor had no reason to think that she would accept any counter offer for a different disposition of her case, nor is it likely she would have proceeded actually to testify against Banks unless she was assured that her case would be disposed of on the terms she proposed.

A "contract implied in fact" arises by a promissory expression which may be inferred from facts and circumstances which show an intent to be bound. (*Juneau Academy v. Chicago Board of Education* (1984), 122 Ill. App. 3d 553.) The prosecutor acknowledged to the court that he told Banks' attorney that if Banks' case were to go to trial, that the State would use defendant Boyt's testimony, that the State "had her testimony, if needed." Whether or not Banks' case went to trial was not a circumstance over which the defendant had any control. Whether the State needed the defendant's testimony or not, it "had" it because the State bought it by agreeing to pay the price asked by the defendant—county jail time, residential drug treatment program, probation. The State's agreement to pay the price for defendant's testimony was not negated because it was able to "use" the fact of the defendant's agreement to testify to provoke a guilty plea from Banks, rather than having to present her actual testimony at Banks' trial in order to secure a conviction.

In light of the prosecutor's conduct after his discussion with defense counsel on August 3, we find meritless the State's argument that it was not bound to proceed with the terms of the agreement because the prosecutor had in effect made defendant a counter offer which could be accepted only by her actual performance of testifying at Banks' trial. Even if the agreement was construed as such a unilateral contract, the State effectively prevented the defendant from performing completely by notifying Banks' attorney that it planned to use her testimony if Banks went to trial. Although the knowledge that the defendant would testify against him may not have been Banks' sole motivation in pleading guilty—thus obviating the need for

either a trial or Boyt's testimony—the prosecutor's plain intent in so advising Banks' counsel was either to begin, or at least to keep, the ball rolling in that direction.

A necessary corollary to each party's duty of good faith and fair dealing is the proposition that a party to a contract may not raise as a defense to its own nonperformance the fact that a condition precedent of the contract has not been met where it was its own conduct which made compliance with the condition impossible. *Lukasik v. Riddell, Inc.* (1983), 116 Ill. App. 3d 339, 346; *Mineral Resources, Inc. v. Classic Coal Corp.* (1983), 115 Ill. App. 3d 114, 121; *Osten v. Shah* (1982), 104 Ill. App. 3d 784, 786.

In such a case, the condition is excused and, insofar as a unilateral contract is concerned, acceptance may be found if a beginning has been made. In the instant case, if effect is given to the State's construction of the contract as unilateral and acceptable by the defendant only by actually testifying against Banks, then defendant's agreement to have her case continued even in part for the reason that she had to wait for Banks' case to reach the trial stage so she could testify must be viewed as the beginning of her performance and valid acceptance of the "counter-offer." The defendant's agreement to await the outcome of motions pending in Banks' case constituted a change of position done in reliance on the prosecutor's promise to dispose of her case in compliance with the terms she proposed. She stood ready and willing at all times to proceed with her testimony against Banks. The State's use of her willingness to testify against Banks was, in part, what induced Banks to plead guilty. Consequently, the defendant's inability to actually testify at trial against Banks was caused by the State and the defendant's beginning of performance by agreeing to allow her case to be continued must be viewed as valid acceptance of the State's offer. *Arco Petroleum Products Co. v. R & D Automotive, Inc.* (1983), 118 Ill. App. 3d 634, 638-39; Corbin, Contracts sec. 49, at 75-76 (1952).

Accordingly, whether the contract is construed as bilateral or unilateral, we conclude the court's finding there was an agreement was not against the manifest weight of the evidence.

■ The State's next argument addresses the question whether the prosecution's refusal to fulfill the agreement denied the defendant due process and whether that denial would sustain the court's order for specific performance of the agreement or its order quashing the indictments.

The State finds the case relied on by the court in announcing its ruling, *Santobello v. New York*, is inapplicable to the instant cause be-

cause no plea was actually entered here. (*Santobello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495.) Further, it argues that two post-*Santobello* cases involving the pre-guilty plea phase of plea bargaining also do not support the relief granted by the court below: *Government of the Virgin Islands v. Scotland* (3d Cir. 1980), 614 F.2d 360; *Cooper v. United States* (4th Cir. 1979), 594 F.2d 12.

Both cases concern a defendant's right to obtain specific performance of a plea offer or agreement made by the prosecution, and *Cooper* was recently relied on in *Johnson v. Mabry* (8th Cir. 1983), 707 F.2d 323. The government's petition for *certiorari* was granted in that case by the United States Supreme Court and, during the pendency of this appeal and after the parties had filed briefs, that court reversed. *Mabry v. Johnson* (1984), 467 U.S. ___, 81 L. Ed. 2d 437, 104 S. Ct. 2543.

The defendant asserts it is clear that the State and the defendant here had an agreement and that the State, after exploiting that agreement for its own purposes, repudiated it to the detriment of the defendant. Consequently, her due process rights were violated and the State's refusal to specifically perform according to the terms of the agreement justified dismissal of the indictments. The defendant urges this court to adopt the rationale expressed in *Cooper*, noting that the *Mabry* decision explicitly rejected the *Scotland* decision. As indicated, however, *Mabry* was reversed by the United States Supreme Court, and we believe we are compelled thereby to likewise reverse the court's dismissal order entered here.

It has been established that the government need not initiate or participate in plea bargaining (*Weatherford v. Bursey* (1977), 429 U.S. 545, 561, 51 L. Ed. 2d 30, 43, 97 S. Ct. 837, 846), nor does a defendant have any constitutional, statutory, or other lawful right to bargain for a conviction for a lesser offense or penalty. (*People v. Hampton* (1973), 14 Ill. App 3d 427.) Nevertheless, plea bargaining has been found beneficial to the administration of justice in that prompt punishment attains society's objectives of punishment more effectively than belated punishment, bargaining results in saving judicial and prosecutorial resources so that more can be conserved for cases that involve substantive issues of defendants' guilt, and a defendant who pleads guilty is more remorseful and more likely to be successfully rehabilitated. The chief advantage of plea bargaining to a defendant, of course, is a reduction either in penalty or potential exposure to penalty. (*Government of the Virgin Islands v. Scotland* (3d Cir. 1980), 614 F.2d 360, 363-64.) Properly administered, plea bargaining "is to be encouraged." *Santobello v. New York* (1971), 404 U.S. 257, 260, 30 L.

Ed. 2d 427, 432, 92 S. Ct. 495, 498.

As noted in the case of *Cooper v. United States* (4th Cir. 1979), 594 F.2d 12, 15-16, courts have routinely drawn upon the ready analogies of substantive and remedial contract law to supply the body of doctrine necessary to lend order to plea bargaining practices, and to afford relief to defendants aggrieved as a result of the negotiating process. The *Cooper* court found such ready analogy to contract law should not be viewed, however, as the outer limits of the analysis. *Santobello* made it clear that the core concept of plea bargaining was fairness, whereas contract law's concern is not solely with fairness, but with an ordered certainty of consequences in complicated negotiation exchanges. Accordingly, *Cooper* recognized that the right to fundamental fairness embraced within substantive due process guarantees does not limit enforcement of plea proposals only to those situations in which a "contract," by technical definition, had been reached.

In that case, the court found that enforcement of the plea proposal which was withdrawn by the government only seconds before the fact of the defendant's acceptance of the offer was actually communicated to the government should not be foreclosed simply because no technical contract had been formed, but should be enforced on the basis alone of "expectations reasonably formed in reliance upon the honor of the government in making and abiding by its proposals." *Cooper v. United States* (4th Cir. 1979), 594 F.2d 12, 18.

The *Cooper* view was not accepted in *Government of the Virgin Islands v. Scotland* (3d Cir. 1980), 614 F.2d 360, in the absence of any claim there that the defendant had relied on the agreement to his detriment. In the *Scotland* case, the prosecutor proposed the defendant plead guilty to one of two felony charges, and to a misdemeanor charge in order to dispose of all the charges pending against him. The prosecution made no sentence recommendation, however, adding that the government's position on that would depend on the defendant's willingness to testify against a codefendant in one of the two felony cases which was proposed in the alternative to be dismissed. The defendant agreed to plead guilty to the misdemeanor charge and to the other felony case which did not involve the codefendant, if the felony case involving the codefendant was dismissed. The defendant also stated that he would not testify for the government against the codefendant in that case.

When the government learned of the defendant's acceptance, it refused to proceed with the agreement unless the defendant would agree to make a sworn statement that his earlier statement implicat-

ing the codefendant was true. The defendant's motion to the court to order specific performance of the initial agreement was denied by the court after the defendant's trial and conviction, on the basis the plea was never officially entered and that the defendant had had a trial.

The Court of Appeals affirmed, declining to follow the *Cooper* rationale in support of specific performance, since it perceived that the defendant had a alternative remedy; to wit, the defendant may withdraw his tendered plea or refuse to consent to any new bargain proposed by the prosecution. Anticipating the criticism that such remedy would be insufficient, the court in its decision hastened to add that resort to this remedy would simply mean the defendant would be afforded his constitutional right to a trial by jury. Significantly, the court observed nonenforcement of the plea bargain agreement would find the defendant in the same position as if he had not been offered a plea agreement "because no detrimental reliance was alleged." (*Government of the Virgin Islands v. Scotland* (3d Cir. 1980), 614 F.2d 360, 365.) The court recognized:

> "When, however, the defendant detrimentally relies on the government's promise, the resulting harm from this induced reliance implicates due process guarantees. This basic estoppel principle was recognized by the Court in *Santobello*; when a defendant pleads guilty in reliance on an agreement with the prosecutor, that promise must be fulfilled. *Santobello* arguably could be extended to cover the situation where the defendant has not yet entered the plea, but has relied on the bargain in such a way that a fair trial would no longer be possible." 614 F.2d 360, 365.

However, because no detrimental reliance was claimed in *Scotland*, the court found no fault with the remedy of the defendant's fair trial and, therefore, no compulsion to apply the *Cooper* rule. See also *People v. Howell* (1983), 119 Ill. App. 3d 1.

We observe that, unlike *Scotland*, the defendant here does argue detrimental reliance on the plea agreement in that she agreed to have her case continued pending disposition of the Banks' case motions. Nonetheless, the State argues specific performance is still not warranted here because "it is clear that the defendant's cases would have been continued even if the prosecutor had not assented to the plea proposal made by the defendant," the reason being that previous continuances had been sought by the defendant in order to await diagnostic evaluations, and so forth, and that defense counsel admitted she was "going on vacation anyway." The State questions what detriment could possibly have accrued to the defendant during the two-week

continuance: what progress could have been made on her case with her attorney away on vacation and in view of the fact her motion to suppress her statements had not yet been filed? These considerations cause the State to conclude the defendant here was not prejudiced by the alleged repudiation of the agreement, but merely disappointed, and that her right to have a fair trial by jury remains intact, is a sufficient remedy, and adequately protects her constitutional rights.

Also, contrary to the court's finding below, the State argues the prosecution's conduct toward the defendant here was not unfair because the proposal originated with the defendant and her reliance on it, therefore, was not governmentally induced. Further, it argues there were extenuating circumstances here which affected the propriety of the agreement which would excuse specific performance, and that the possibility of such extenuating circumstances was specifically noted in *Cooper*. (594 F.2d 12, 19.) The State has reference here to the fact Banks pleaded guilty and defendant's testimony against him, therefore, became unnecessary. Consequently, it was an "extenuating circumstance" affecting the propriety of the agreement, and the court should not have ordered it to be specifically enforced.

We agree with the trial court's assessment below that the key to this case is fundamental fairness. However, we believe the recent reversal of the *Mabry* case dictates that the remedy afforded the defendant here be viewed as too expansive and not constitutionally mandated. Hence, it must be reversed.

The question decided in the United States Supreme Court *Mabry* decision was whether a defendant's acceptance of a prosecutor's proposed plea bargain creates a constitutional right to have the bargain specifically enforced. The court there determined that it did not. The court stated one of the reasons it granted *certiorari* was because of a conflict in the circuits, referring *inter alia* to the *Cooper* and *Scotland* cases which have been discussed by the parties here. (*Mabry v. Johnson* (1984), 467 U.S. ___, ___, 81 L. Ed. 2d 437, 442, 104 S. Ct. 2543, 2546.) *Mabry* determined the respondent there could not successfully attack his guilty plea which was entered pursuant to a second offer from the prosecutor after the prosecutor repudiated his first offer which had been accepted by the respondent. The court found the guilty plea was in no sense induced by the prosecutor's withdrawn offer, nor did it rest on any unfulfilled promises. The respondent was fully aware of the terms of the offer upon which his plea was based and his inability to enforce the prosecutor's first offer was determined to be without constitutional significance. Additionally, the court found irrelevant to the analysis the question whether the prosecutor was

negligent or otherwise culpable in making the first offer and then withdrawing it after the respondent had accepted. The court stated:

> "A plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest. It is the ensuing guilty plea that implicates the Constitution." *Mabry v. Johnson* (1984), 467 U.S. ___, ___, 81 L. Ed. 2d 437, 442, 104 S. Ct. 2543, 2546.

Acknowledging that the conditions for a valid plea " 'presuppose fairness in securing agreement between an accused and a prosecutor' " (467 U.S. ___, ___, 81 L. Ed. 2d 437, 443, 104 S. Ct. 2543, 2547), the court noted:

> "It follows that when the prosecution breaches its promise with respect to an *executed plea agreement*, the defendant pleads guilty on a false premise, and hence his conviction cannot stand ***." (Emphasis added.) (*Mabry v. Johnson* (1984), 467 U.S. ___, ___, 81 L. Ed. 2d 437, 444, 104 S. Ct. 2543, 2547.)

The court determined to be irrelevant the negligence or culpability of the prosecutor with regard to the first offer which was withdrawn after acceptance because:

> "The Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty. Here respondent was not deprived of his liberty in any fundamentally unfair way." 467 U.S. ___, ___, 81 L. Ed. 2d 437, 444, 104 S. Ct. 2543, 2548.

Defendant here never progressed to the stage of entering a plea and, apparently, the only relevance the State's repudiation of the agreement would have to the defendant's due process rights in the instant cause would be if the defendant had been deprived of her liberty in any fundamentally unfair way. In the absence of any indication in the record here that such deprivation occurred, the State's repudiation of the unexecuted plea agreement did not amount to a due process violation which would authorize dismissal of the indictments against her.

Accordingly, the judgment of the circuit court of Kane County is reversed, and the cause remanded for further proceedings.

Motion to dismiss appeal denied; judgment reversed, cause remanded.

SEIDENFELD, P.J., concurs.

JUSTICE REINHARD, specially concurring:

Even assuming the State broke a plea agreement with the defendant, no plea of guilty was entered by defendant here in reliance thereon, and defendant has not shown under the facts here any other violation of his constitutional right to due process under the Federal or State constitutions or any violation of State law. I believe this case to be controlled by *Mabry v. Johnson* (1984), 467 U.S. ___, 81 L. Ed. 2d 437, 104 S. Ct. 2543, and the majority's extensive analysis of contract law and much of its other discussion on this issue is unnecessary and somewhat confusing in the light of the holding in *Mabry.* I therefore concur only in the result for the reason stated herein.

I do, however, concur with that portion of the analysis in the majority opinion which denies the defendant's motion to dismiss the State's appeal.