# Illinois Official Reports

## Appellate Court

---

### *People v. Banks*, 2020 IL App (2d) 180509

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JASON B. BANKS, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-18-0509 |
| Filed | March 12, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 17-CF-1146; the Hon. Daniel B. Shanes, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Eric F. Rinehart, of Malia & Rinehart, P.C., of Waukegan, for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Mary Beth Burns, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1        A jury found defendant, Jason B. Banks, guilty of four counts of unlawful delivery of a controlled substance (720 ILCS 570/401(a)(1)(A) (West 2016)). The trial court sentenced defendant to 17 years' imprisonment for each conviction, to be served concurrently. On appeal defendant argues that the trial court erred by (1) denying his motion to dismiss the indictment based on a violation of his cooperation agreement with the police, (2) denying his motion to suppress evidence obtained through electronic surveillance, because the State presented no evidence justifying an exception to the Illinois eavesdropping statute (720 ILCS 5/14-1 *et seq.* (West 2016)), (3) admitting evidence obtained through electronic surveillance, (4) denying his motion for a mistrial, due to discovery violations by law enforcement, (5) admitting evidence of his prior bad acts, (6) denying his motion for a mistrial, based on comments made by the prosecutor during closing arguments, and (7) sentencing him to 17 years' imprisonment, after stating during a pretrial conference that a lower sentence would be appropriate.

¶ 2        Defendant's claim that the trial court erred when it denied his motion to dismiss the indictment is dispositive of this appeal. We hold that the trial court erred by denying defendant's motion to dismiss the indictment. For the reasons that follow, we reverse.

## I. BACKGROUND

¶ 4        This case arises out of six alleged drug sales that occurred between January and March 2017. Four of the six sales were recorded on law-enforcement surveillance recording devices placed in a government cooperator's vehicle. The other two sales were not recorded.

¶ 5        On March 16, 2017, defendant was arrested in connection with the drug sales. Defendant then agreed to cooperate with the Lake County Metropolitan Enforcement Group (MEG) division of the Illinois State Police (ISP) and the United States Drug Enforcement Agency (DEA). Defendant's cooperation led to the arrest of one offender. On April 25, 2017, a grand jury indicted defendant on six counts of unlawful delivery of a controlled substance (720 ILCS 570/401(a)(1)(A) (West 2016)).

¶ 6        Prior to the trial, defendant filed a motion to dismiss all counts of the indictment, based on a violation of the cooperation agreement he had with the police pursuant to *People v. Stapinski*, 2015 IL 118278.

¶ 7        The State moved to admit evidence of defendant's prior bad acts. Specifically, the State sought to introduce evidence that, during his interview with law enforcement on March 16, 2017, defendant said that he had purchased 50 to 100 grams of heroin per month from two suppliers, that he could buy 250 to 500 grams of heroin, and that he had four to five customers. Defense counsel objected to the admission of this evidence as uncharged conduct that was not sufficiently tied to the allegations in the indictment. The trial court ruled that the evidence was admissible, finding that it was relevant to show "an ongoing pattern of conduct."

¶ 8        On August 16, 2017, a hearing was held on defendant's motion to dismiss the indictment.

¶ 9        Agent Nicholas Lancaster of the DEA testified as follows. On March 16, 2017, at the Grayslake Police Department, defendant agreed to cooperate with law enforcement. MEG special agent Greg Pilaski was also present at the meeting. Lancaster "informed [defendant] that he would have to perform undercover drug buys from his source of supply and help law enforcement infiltrate the drug-trafficking organization." Defendant would be working as an

informant with MEG agents. According to Lancaster, defendant "gave us the name of his source of supply and told us he could buy heroin from that individual." Defendant was told that he had to "cooperate fully." While Lancaster was present, defendant was made no specific promises, except that law enforcement would talk to the prosecutors about defendant's cooperation. Defendant was not given a time frame during which he was required to cooperate, and he was not told a specific number of buys that he had to make. Defendant was told that "he had to make as many buys as necessary" "[u]ntil the prosecutor and the Court decides that he cooperated enough for consideration." In return for defendant's cooperation, "we would inform the prosecutor." Defendant was not told that his case would be dismissed or that he would not be charged with any crimes. Defendant signed a DEA "Confidential Source Agreement." Lancaster testified, "if people want to work their charges off, they will contact us." "[W]orking off the charges" means, "whether it's two or three cases that are equal or better, we let Reggie [(Matthews, the supervisor for the narcotics division in the state's attorney's office,)] know and have him finally decide to proceed with the charges or not, or if they could only do one case, if Reggie wants to take that into consideration for a lighter sentence, that's up to Reggie." In subsequent testimony, Lancaster agreed that, if defendant "was going to work as an informant," Lancaster was "not planning to charge him." At the end of the meeting, defendant was told that MEG agent Steve Teschner "would be in touch with him soon in order to set up some sort of drug buy."

¶ 10    During direct examination by defense counsel, Teschner testified as follows. Teschner first spoke with defendant at the Grayslake Police Department on March 16, 2017. Defendant had first spoken to Lancaster. Teschner and defendant agreed that defendant would work for Teschner. Teschner's understanding of the agreement was "[t]hat [defendant] was going to provide [the police] with additional cases to work off charges that he [had] currently." Teschner used the term "working off charges" with defendant many times. Teschner agreed that working "off" meant that the charges would go away. Teschner also testified that he told defendant that working off the charges meant that Teschner would "talk to the prosecutor." Defendant would be working with MEG and not with the DEA. Pilaski, Teschner's supervisor, advised defendant that the agreement meant assisting in the arrest of two or three individuals who had cases that were equal to or greater than defendant's case. Teschner also reminded defendant of this part of the agreement in person and on the telephone, and defendant acknowledged it. The plan was "open-ended for [defendant], open for [defendant] to determine who to sell to—who [defendant] would use to sell."

¶ 11    Teschner testified that, in mid-March 2017, defendant attempted to "set up" the first target, a woman named Tracy. Tracy was supposed to meet defendant in Waukegan and "pick up the product." Although the operation was unsuccessful, MEG continued to work with defendant and proceeded with the second target, Jeffrey Mallard. Defendant knew that Mallard trafficked in heroin, and defendant set up a drug deal with him at a specific location. On March 27, 2017, the police surveilled defendant as he met with Mallard. Defendant gave the police a signal that Mallard had the heroin. Mallard was arrested on the scene, and defendant's cooperation directly led to the arrest. Mallard had over 100 grams of heroin. After Mallard's arrest, Teschner asked defendant to attempt to set up Tracy again. Defendant told Teschner that other targets had figured out that defendant was involved in Mallard's arrest. Between the second and third week of April 2017, Teschner instructed defendant to keep in contact with him and to let him know if there was anyone that defendant would be able to "work with." Teschner

and defendant spoke several times after that conversation. According to Teschner, defendant was "very communicative" after Mallard's arrest. However, between mid-April and April 24, 2017, communication became less frequent. Defendant had "stopped calling" during this time, but he had not failed to return Teschner's calls. Defendant told Teschner that he could not get anyone to work with, because people knew about what happened with Mallard. The third week of April, Teschner testified that he and Lancaster "notified Reggie Matthews *** of this incident and we thought that because [defendant] was not able to do an additional case that we needed to get a warrant for [defendant]." Teschner and other police agents approached the Lake County State's Attorney's Office to charge defendant with the original six drug offenses that occurred in early 2017. Teschner did not warn defendant that the charges were coming, and he did not give defendant a deadline with respect to setting up more targets. Teschner testified that he and Lancaster "thought that because [defendant] was not able to do an additional case that we need to get a warrant for him." A warrant was issued for defendant on April 24, 2017.

¶ 12        During recross-examination by the prosecutor, Teschner testified that he did not mean that the charges would go away based on the original agreement and he did not tell defendant that the charges would go away.

¶ 13        The prosecutor called Pilaski, who testified as follows. Shortly after defendant was arrested on March 16, 2017, at approximately 4:30 a.m., Pilaski and two DEA agents, including Lancaster, met with defendant at the police station. At 9:04 a.m. defendant signed a DEA "Confidential Source Agreement," wherein defendant agreed to assist the DEA. Defendant signed a written *Miranda* waiver form at 9:39 a.m. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Pilaski told defendant that he would have to assist in the arrest of "two or three" individuals who committed offenses equal to or greater than defendant's. This part of the agreement was verbal and was not reduced to writing. In return, the agents would "make a call" to the prosecutor's office explaining defendant's assistance. Pilaski never told defendant that he would not be charged.

¶ 14        During cross-examination, Pilaski testified as follows. The conversation leading to the confidential source agreement was not recorded. After defendant signed the agreement, defendant provided a written statement about the six alleged drug sales. On March 18, 2017, Pilaski told defendant that Teschner "would be his point of contact." Pilaski had no other contact with defendant after the March 16 meeting. Teschner worked most closely with defendant after March 16. In the middle of April, defendant assisted in setting up the arrest of Mallard, who had committed an offense that was equal to or greater than his. Pilaski was not aware of any phone call or text that Teschner made to defendant that he did not return. Near the end of April, Pilaski and Lancaster decided to call the state's attorney's office to let them know to file charges against defendant. "Working charges off" was a common phrase, and Pilaski had heard Teschner use it before.

¶ 15        Defendant testified as follows. On March 16, 2017, he was arrested by MEG and DEA agents for several drug "deliveries." DEA agents told defendant that, if he wanted the charges dismissed, he would have to work with MEG, and defendant agreed to cooperate. "I signed some papers and they let me go." The agents gave defendant a phone number to call. According to defendant, he was not told the specifics of the agreement; he was told only that he had to cooperate with MEG. A day or so after he was released, he made initial contact with Teschner, who had not been present when he was asked to cooperate. Defendant told Teschner that Tracy, who was a "runner" for larger drug deals, would sell him 25 or 50 grams of heroin. Defendant

- 4 -

called Tracy while Teschner listened on speaker phone, and the deal was on. But the deal fell through when Teschner called off the police surveillance, after defendant and Teschner had waited 30 to 45 minutes for Tracy to arrive at the predetermined location. After the deal did not come to fruition, Teschner told defendant, "realistically if you want your charges to go away, you've got to give me 100 to 150 grams of heroin." Teschner said that "would be enough to work off your charges." Defendant understood this to mean that if he got someone to sell him 100 to 150 grams of heroin "[his] charges would be gone, and [he] could get on with [his] life."

¶ 16    Defendant testified that about a week later he arranged for a drug deal with Mallard. Defendant told Teschner about the deal, and Teschner gave defendant a date and time "to make everything happen." Defendant and Teschner worked together to set up the operation. Defendant met Mallard at a liquor store, and defendant entered Mallard's vehicle. Mallard showed defendant drugs, and defendant told Mallard that he had to go and get the money and would meet Mallard back at the same location. Mallard agreed and put the drugs away, under the front seat. Defendant went into the liquor store, called Teschner, and told him that Mallard had the drugs, and then the police arrested Mallard. After the arrest, Teschner said to defendant, "great job *** everything should be okay." Teschner shook defendant's hand, and they went their separate ways. Defendant thought that, because he helped arrange for the arrest of someone with 100 to 150 grams of heroin, "it was over with." Defendant did not know whether his charges were dropped, and he did not know what to do next. Defendant continued to return Teschner's phone calls.

¶ 17    Defendant also testified that Teschner called defendant a few days after Mallard's arrest. Teschner wanted to arrange another deal with Tracy. Defendant told Teschner that it would be difficult because the police were not providing him with any money for transactions and because Mallard had identified defendant as cooperating with the police. After this conversation, Teschner and defendant would check in occasionally, but Teschner never gave defendant a deadline or told him that he needed to "get" someone by April 24. Teschner told defendant, "Just be patient. You've got time. Just relax." Defendant always returned Teschner's phone calls. Defendant testified that he could have arranged future busts once everything died down. Without warning, defendant was arrested on April 25, 2017.

¶ 18    The parties stipulated that, when he was arrested on April 25, 2017, defendant told the arresting officers that he thought that he had successfully performed his obligations under the cooperation agreement.

¶ 19    After hearing argument on the motion to dismiss based on *Stapinski*, the trial court denied the motion. The trial court stated:

"The facts in *Stapinski* were that the law enforcement officer entered into a cooperation agreement with the defendant there, *Stapinski*, in which he promised not to charge the defendant if he assisted in the apprehension of other people. Note that it's two other people similar to the testimony we heard from law enforcement in this case. The *Stapinski* court also noted that the defendant fulfilled his obligations.

There [are] two parts to it. The first is what the agreement was. Here the Court does not find such an explicit agreement was actually ever made to [defendant]. And then, second, the evidence fails to establish that [defendant] fulfilled the obligations under it. So without belaboring the point, *Stapinski* is a situation in which the Court found that the governmental conduct based upon the facts of that case shocks the conscience

- 5 -

and violates the decencies of civilized conduct. Whatever exactly that standard is, it substantial and has not been shown here. So the motion to dismiss is denied."

¶ 20    After a trial, a jury found defendant guilty of four counts of unlawful delivery of a controlled substance (720 ILCS 570/401(a)(1)(A) (West 2016)). The trial court sentenced defendant to 17 years' imprisonment for each conviction, to be served concurrently. Defendant filed a timely notice of appeal.

¶ 21                                    II. ANALYSIS

¶ 22    Defendant argues that, under the principles set forth in *Stapinski*, 2015 IL 118278, the trial court erred by denying his motion to dismiss based on a violation of his cooperation agreement with the police. Defendant argues that his due process rights were violated when the police breached the cooperation agreement, which defendant relied upon to his detriment.

¶ 23    Generally, a trial court's ultimate ruling on a motion to dismiss charges is reviewed under the abuse-of-discretion standard, but where the issues present purely legal questions, the standard of review is *de novo*. *Id.* ¶ 35. Whether a defendant was denied due process and whether that denial was sufficiently prejudicial to require the dismissal of the charges are questions of law, which are reviewed *de novo*. *Id.* However, once it is determined that a defendant suffered a prejudicial violation of his due process rights, the trial court's decision on the appropriate remedy, whether it be dismissal of the indictment or some other remedy, is reviewed for an abuse of discretion. *Id.*

¶ 24    The principle for enforcing cooperation agreements arises under the due process clause of the fourteenth amendment. *State v. Wacker*, 688 N.W.2d 357, 362 (Neb. 2004); *People v. Manning*, 672 P.2d 499, 504 (Colo. 1983) (*en banc*). "Generally, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected." (Internal quotation marks omitted.) *Wacker*, 688 N.W.2d at 362. "[W]here the government has entered into an agreement with a prospective defendant and the defendant has acted to his detriment or prejudice in reliance upon the agreement, as a matter of fair conduct, the government ought to be required to honor such an agreement." (Internal quotation marks omitted.) *Id.*

¶ 25    The trial court's factual findings regarding the existence of an oral agreement, as well as its terms and conditions, will not be disturbed unless those findings are against the manifest weight of the evidence. *People v. Boyt*, 129 Ill. App. 3d 1, 14 (1984). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 26    Defendant argues that the trial court's finding that there was no express agreement was against the manifest weight of the evidence. Defendant contends that Teschner promised defendant that he would not be prosecuted if defendant assisted in the arrest of two or three offenders who had committed offenses at least as serious as defendant's and that there was no stated deadline for defendant's performance. In the alternative, defendant argues that he and Teschner had an implied contract, because defendant reasonably relied on Teschner's promises to defendant's detriment. The State argues that the trial court properly found that the parties merely agreed that, if defendant assisted in apprehending two other people, his cooperation would be reported to the state's attorney's office. The State also contends that the court properly found that defendant failed to fulfill his obligations under the agreement.

¶ 27        In *Stapinski*, 2015 IL 118278, our supreme court explained:

> " 'Generally, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected.' [Citation.] '[W]here the government has entered into an agreement with a prospective defendant and the defendant has acted to his detriment or prejudice in reliance upon the agreement, as a matter of fair conduct, the government ought to be required to honor such an agreement.' " *Id.* ¶ 48 (quoting *State v. Wacker*, 688 N.W.2d 357, 362 (Neb. 2004)).

¶ 28        Further, courts construe cooperation agreements under contract principles. *Id.* ¶ 47. Cooperation agreements are construed strictly against the government, and "courts should not hesitate to scrutinize the government's conduct to ensure it comports with the highest standard of fairness." *Id.* In addition, cooperation agreements do not need to be in writing (see, *e.g.*, *id.* ¶¶ 3-25 (discussing terms of the defendant's "valid oral cooperation agreement")), although we note that creating such a writing is preferable. However, whether the agreement is in writing or conveyed verbally, police officers have the power, by their words, to bind the prosecution to a resolution that is enforceable. See *id.* ¶ 55. Finally, words employed with ambiguous meanings should be carefully considered but, in the end, should be construed against the government, especially when those words are relied upon to persuade a defendant to act in exchange for dismissal of pending charges. See *id.* ¶ 47.

¶ 29        Here, the trial court's findings regarding the agreement are not supported by the evidence presented. The record shows that after defendant's meeting with DEA and MEG agents on March 16, 2017, he dealt only with Teschner. Teschner testified that he and defendant entered into an agreement. According to Teschner, defendant "was going to provide us with additional cases to *work off charges* that he has currently." (Emphasis added.) As to defendant's obligations, he agreed to assist in the arrest of two or three individuals who had cases equal to or greater than his. Teschner testified that working "off" charges meant that defendant's charges would go away or that he would not be charged. In the middle of April 2017, defendant successfully assisted in the arrest of Mallard, who possessed over 100 grams of heroin, an offense equal to or greater than defendant's. Subsequently, it became difficult for defendant to arrange any deal, because people found out that defendant was a "snitch." In the 10 days after Mallard's arrest, Teschner and defendant kept in touch. Lancaster, Teschner, and defendant testified that there was no specified deadline for defendant's performance. Thus, defendant had a reasonable time to complete his obligations. See *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 773 (2007) ("Where a contract does not specify a time for performance, a reasonable time will be implied."). On April 25, 2017, approximately 10 days after Mallard's arrest, without warning or notice of dissatisfaction with defendant's performance, defendant was arrested.

¶ 30        By arresting defendant, the police made it impossible for defendant to complete his performance. The law implies in every contract a promise of good faith and fair dealing. *Boyt*, 129 Ill. App. 3d at 15. This includes the proposition that a party to a contract may not raise as a defense to its own nonperformance the fact that a condition precedent of the contract has not been met where the party's own conduct made compliance with the condition impossible. *Id.* at 16. Here, defendant's nonperformance, that is, his failure to assist in a second arrest, was rendered impossible by the police arresting him approximately 10 days after they had arrested Mallard. There was no mutual understanding that time was of the essence. Teschner was required to give notice of termination that included a reasonable period of time for defendant

to complete the agreement. By failing to give notice and wait a reasonable period of time for completion of the agreement, the abrupt termination by the State was ineffective. See *Rose v. Mavrakis*, 343 Ill. App. 3d 1086, 1092 (2003); *Wickenhauser v. Selhime*, 75 Ill. App. 2d 413, 420 (1966). We conclude that the trial court's finding that there was no express agreement was against the manifest weight of the evidence. Further we determine that the police, and not defendant, breached the agreement. Accordingly, defendant was entitled to the dismissal of the indictment.

¶ 31    The State contends that the trial court properly denied defendant's motion to dismiss, because, unlike defendant here, in *Stapinski*, the defendant met his obligation.

¶ 32    However, in *Stapinski*, as in this case, there was conflicting testimony regarding the agreement. In *Stapinski*, Romeoville police sergeant Christine Masterson testified that she told the defendant that if he cooperated with the police in apprehending the person to whom he was to deliver a package containing ketamine, the defendant would not be charged with possession of ketamine. *Stapinski*, 2015 IL 118278, ¶ 14. But Masterson also testified that she told the defendant that he must assist with four cases to avoid the ketamine charge. *Id.* The defendant testified that, after he assisted the police with apprehending the intended recipient of the ketamine, the defendant was known as a " 'snitch.' " The defendant could no longer assist with other drug arrests, and police officer Mimi Bedja stopped taking the defendant's calls. *Id.* Bedja testified that she told the defendant that, if he cooperated with three drug investigations involving offenses of the same class as or higher than his offense, Bedja would tell the state's attorney of the defendant's cooperation. *Id.* ¶ 23. Bedja also testified that, after the defendant assisted in the arrest of the intended ketamine recipient, the defendant stopped returning her calls. *Id.* Bedja then told Masterson that the defendant had not fulfilled his obligations, and Masterson filed a criminal complaint charging the defendant with unlawful possession of a controlled substance containing ketamine, with intent to deliver (720 ILCS 570/401(a)(10.5) (West 2010)). *Stapinski*, 2015 IL 118278, ¶¶ 23-24. Masterson testified that she filed the complaint because Bedja told her that the defendant did not assist in four cases as they had agreed. *Id.* ¶ 24. The supreme court held that "defendant's substantive due process rights were violated when the State breached the agreement Masterson entered into with defendant." *Id.* ¶ 52.

¶ 33    Like *Stapinski*, there was more than one agreement with defendant. One with the DEA and another with Teschner. Teschner promised defendant that, if he assisted in two arrests of individuals with cases equal to or greater than defendant's, his case would be dismissed. Construing this agreement against the government, as we must (*id.* ¶ 48), we determine that defendant's due process rights were violated when the police breached defendant's agreement with Teschner and when the police prematurely charged and arrested defendant, thereby preventing him from completing his obligations. Where the government enters into an agreement with a prospective defendant and he acts to his detriment in reliance on the agreement, as a matter of fair conduct, the government is required to honor such an agreement. *Id.* (citing *Wacker*, 688 N.W.2d at 362). Here, defendant cooperated with Teschner in apprehending a drug source. Defendant relied on Teschner's promise that his charges would be dismissed, and in the process of fulfilling his obligations under the agreement, defendant incriminated himself. "Thus, defendant suffered a prejudicial violation of his due process rights." *Id.* ¶ 55. Accordingly, we determine that the trial court abused its discretion by denying defendant's motion to dismiss.

¶ 34      For the foregoing reasons, the judgment of the trial court is reversed.

¶ 35                          III. CONCLUSION

¶ 36      The judgment of the circuit court of Lake County is reversed.

¶ 37      Reversed.