2024 IL App (1st) 221645-U

FIRST DIVISION
August 5, 2024

No. 1-22-1645

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 10 CR 1469301 |
| SHAWN SMITH, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Erica Reddick, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Pucinski concurred in the judgment.

**O R D E R**

¶ 1   *Held*:   The circuit court's denial of the petition for a certificate of innocence is affirmed, where the petitioner failed to establish by a preponderance of the evidence that he was innocent of the offenses charged in the indictment. See 735 ILCS 5/2-702(g)(3) (West 2018).

¶ 2   Following a 2014 jury trial in the circuit court of Cook County, the petitioner, Shawn Smith, was convicted of armed robbery and aggravated battery with a firearm and sentenced to

consecutive terms of 26 and 20 years in prison. On appeal, the petitioner's conviction was reversed on the basis that his trial counsel was ineffective because, at the motion to suppress hearing, he failed to challenge the lack of expert testimony to lay a foundation for the clandestine and unauthorized surveillance technology used by the Chicago Police Department to achieve the petitioner's arrest without a warrant or probable cause. *People v. Smith*, 2017 IL App (1st) 141814-U (*Smith I*). In accordance with our supreme court's supervisory order (*People v. Smith*, 89 N. E. 3d 762 (Sept. 27, 2017)), we vacated the reversal of the petitioner's conviction but remanded the matter for appointment of new defense counsel and the filing of an amended motion to quash arrest and suppress evidence before a different judge. *People v. Smith*, 2017 IL App (1st) 141814-UB (*Smith II*). On remand, the State chose not to challenge the new motion, and the circuit court entered an agreed order suppressing the evidence obtained as a result of the petitioner's arrest, vacating the petitioner's two convictions, and dismissing the remainder of the *nolle prosequi* counts in his original indictment.

¶ 3     The petitioner subsequently filed a petition for a certificate of innocence pursuant to section 2-702 of the Code of Civil Procedure (Code) (735 ILCS 5/2-702 (West 2018)). After a hearing, the circuit court denied that petition, finding that the petitioner had failed to establish by a preponderance of the evidence that he was innocent of the offenses charged in the indictment. The petitioner now appeals contending that this finding was erroneous. For the following reasons, we affirm.

¶ 4                              I. BACKGROUND

¶ 5     Because the facts of this case are fully set forth in our order remanding the matter for a new suppression hearing (*Smith II*, 2017 IL App (1st) 141814-UB), we set forth only those facts relevant to the resolution of the issues raised here.

¶ 6     In 2010, the petitioner was charged by indictment with attempt first degree murder, armed robbery with a firearm, and aggravated battery with a firearm for his alleged involvement in the July 8, 2010, robbing and shooting of the victim, Carl Morrison, at 310 North Long Avenue in Chicago.[1]

¶ 7     Prior to trial, the petitioner filed a motion to quash arrest and suppress evidence. Relevant to this appeal, at the hearing on this motion, the petitioner testified that he was arrested, and that his cell phone was confiscated, while he was on his way to work after leaving school at about 2 p.m. on July 22, 2010. The petitioner acknowledged that he bought the cell phone only a couple of days prior to being stopped by the police. He averred that he purchased the phone "in the street" on July 18, 2010, from James Williams, an individual he knew from high school. The petitioner stated that the cell phone did not work at first and that he had to "get the bill paid" and register the telephone in his own name before he could use it. The petitioner stated that a female friend paid that bill for him and that he registered the cell phone in his own name a day after he purchased it at a U.S. Cellular store on "19th and North Avenue[s]." The petitioner also claimed that the phone had been turned off and was inside his pocket since about 1 p.m. and until he was stopped and arrested by the police that afternoon.

¶ 8     In response, the State offered the testimony of several Chicago police officers. Detective Anthony Reyes first testified that in June 2010 he was assigned to investigate a string of armed robberies that had occurred on June 1, June 11, July 7 and July 8, of that year. According to the detective, those four armed robberies had two things in common: a telephone number and the description of the offender. With respect to the telephone number, all four offenses involved an offender telephoning a restaurant to order food, from telephone number: 773-981-5292. Once the

---

[1] Although the indictment initially charged the petitioner with unlawful use of a weapon by a felon and personal discharge causing great bodily harm, those charges were *nolle prossed* by the State prior to trial.

food was delivered, the delivery driver was robbed at gunpoint for food and money, with the last robbery escalating as a result of a struggle and the victim, Morrison, being shot in the stomach. With respect to the offender, the descriptions given were of a male African American somewhere between 5' 5" and 5' 8" tall, and "approximately 17 to early 20s, 23 years old."

¶ 9    Detective Reyes testified that as part of his investigation he obtained a court order which permitted the Organized Crime Division of the Chicago Police Department to follow up with a "pinging system" that allowed them to "track this phone."

¶ 10    Chicago Police Sergeant Brian Roney, who was a technician in the Organized Crime Division, next testified that after receiving the aforementioned court order, as part of his investigation into the string of armed robberies, on July 22, 2010, he operated a "pen register" surveillance device from an SUV in downtown Chicago, which allowed him to monitor and track telephone number 773-981-5259. Sergeant Roney stated that he was aware that the offender, was a male African American, "late teens, early 20s and about 5'6", 5'7" something like that," and that he observed an individual of that description put a hand-held device to his head on Wabash Avenue, while he was monitoring the "pen register" surveillance device. This ultimately led to the petitioner's arrest, upon which the cell phone associated with the number used in the armed robberies was recovered.

¶ 11    At present, it is undisputed that while Sergeant Rooney testified that he was operating an authorized "pen register" to track the cell phone number, the device actually used was a "cell site simulator" also known as "triggerfish" or "Stingray," which permitted the police to track a suspect simply by aiming the device into a crowd of people and obtaining information from that cell phone, and which no court had ever authorized the police to use in this case.

¶ 12    After the circuit court denied the petitioner's motion to quash arrest and suppress evidence,

4

the petitioner unsuccessfully filed several motions *in limine*. Relevant to this appeal, the petitioner unsuccessfully sought the admission of evidence regarding an alternate suspect, namely Williams. In addition to testimony that Williams sold him the cell phone a few days prior to his arrest, the petitioner sought to testify that in April 2010, he had observed Williams committing a robbery of a food delivery driver near 219 North Long Avenue, which was in close proximity to where the instant crime had occurred. In addition, the petitioner wanted to introduce evidence that on October 26, 2010, the police executed a search warrant at that address, with Williams as the target, and recovered a .22 caliber revolver that matched the description of the gun used in the instant robbery. Finally, the petitioner maintained that Williams, who was subsequently arrested on January 30, 2012, closely matched the description of the instant offender. The circuit court, however, denied the petitioner's motion *in limine*.

¶ 13    In December 2013, the petitioner proceeded with a jury trial at which the following relevant evidence was adduced.

¶ 14    The victim, Morrison, who was both a retired United States Marine and a three-time former convicted felon[2], testified that at about 5:20 p.m. on July 8, 2010, he was working as a delivery driver for Barney's Pizza, and was assigned to deliver a pizza to 310 North Long Avenue. The telephone number used to place the order was recorded as 773-981-5292. Once at the address, Morrison called the telephone number, which was listed on the order receipt, and spoke to a "young man" who was inside the house, and who indicated that he would be coming out. Morrison, who had exited his car to get the order ready, observed the "young man" he was speaking to through an open window in the building. At trial, he identified that "young man" as the petitioner.

¶ 15    According to Morrison, the petitioner then came out of the house and asked, "How much

---

[2] Morrison had been convicted twice for burglary and once for possession of a stolen motor vehicle.

is it?" Morison walked to the rear passenger door of his car to check the price on the receipt, but when he turned around, the petitioner was "up on [him]" and pointed a small black revolver at his chest. Morrison pushed the gun down, and "it went off in [his] stomach." Morrison asked the petitioner why he shot him, but the petitioner instructed him not to move, then pushed him back into the car, reached into his pocket, and took about $20, before walking away. While Morrison conceded that the entire encounter from when he turned around to when he was shot lasted a few seconds, he stated that it "seemed like slow motion."

¶ 16    Morrison drove himself to the hospital where he spoke to police officers. Morrison described his attacker as a black male, with light skin, and a low haircut (*i.e.*, a "bald fade,"), about 5'7" or 5' 8" tall, 130 or 140 pounds, and wearing a green T-shirt and blue jeans.

¶ 17    Morrison was subsequently transported to another hospital where he had to undergo surgery to repair the damage to his colon resulting from the gunshot wound. The bullet was not removed.

¶ 18    Morrison further testified that several weeks later, on July 22, 2010, he identified the petitioner from a lineup as the person who shot and robbed him.

¶ 19    Detective Reyes and Sergeant Roney next testified consistently with their testimony at the suppression hearing, regarding their identification of the petitioner as the person in possession of the cell phone associated with the robberies and the petitioner's arrest.

¶ 20    The State then introduced other crimes evidence through the testimony of Chung Don. Don testified that on July 7, 2010, he worked as a delivery driver at See Through Kitchen Chinese Restaurant. On that day, at about 5:30 p.m., he proceeded to 310 North Long Avenue to deliver an order that was placed from phone number 773-981-5292. Once at the address, Don telephoned the number and was told someone would come down. Two men approached Don's car, one on the

passenger side and one on the driver's side. Don identified the petitioner in court as the individual who approached him on the passenger side. The passenger side window was open a crack, and the petitioner pointed his gun through the window and demanded Don's money and the food. Once Don obliged, the petitioner left. The entire encounter lasted less than a minute.

¶ 21   Don testified that on July 22, 2010, he identified the petitioner from a lineup at the police station. On cross-examination, he admitted that when he initially spoke to police about the incident, he described the robber as a young black man, medium size, "not too tall, not too short," about 5' 6", 140 pounds with light skin color. He denied, however, telling the police that the robber wore braids or that he had a yellow complexion and therefore may have been biracial.

¶ 22   Chicago Police Sergeant James McGovern next testified that he conducted two separate lineups that were viewed by Don and Morrison and that both victims immediately identified the petitioner from those lineups as the person who robbed them.

¶ 23   The parties stipulated that the records for the cell phone recovered from the petitioner established that it was a prepaid number not associated with any name and that this was the same number that had been used to call the restaurants that employed both Morrison and Don, shortly before they were robbed.

¶ 24   In his defense, the petitioner first called Chicago Police Officer Alan Rogers, who testified that he interviewed Don on the morning following the robbery whereupon Don told him that the robber had braids and was possibly biracial because of his light complexion. Officer Rogers, however, explained that this interview was conducted with the help of another person working at the restaurant and not through an official Chinese language interpreter.

¶ 25    The petitioner next called Chicago Police Officer Jesus Vasquez who interviewed Morrison at the hospital immediately after the shooting. While the officer remembered asking

Morrison for a description of the shooter, he could not recall whether Morrison indicated that the shooter had a low hair style.

¶ 26    The petitioner also testified on his own behalf, stating that on July 7 and July 8, 2010, he was living in Maywood with his father, and working as an overnight manager at the McDonald's restaurant at Madison Street and Karlov Avenue. The petitioner stated that he worked between 10 p.m. and 6 a.m. Tuesdays through Saturdays.

¶ 27    The petitioner averred that he worked that same night shift both on July 7 and July 8, 2010, and that after he finished work, he took the bus to his aunt's house at 5837 Washington Boulevard because it was more convenient than returning to Maywood. The petitioner stated that on both of these days, he arrived at his aunt's house at about 6:45 a.m. Because his aunt, who was a registered nurse, was at work, and his mother was not at home, the petitioner's brother, Michael Smith, let him inside.

¶ 28    The petitioner explained that he and Smith had a routine of taking their young cousins to school Tuesdays through Thursdays. After doing so they would return home at about 10 a.m. whereupon the petitioner would eat breakfast and talk to his mother and then go to sleep until about 8 p.m., before heading back to work.

¶ 29    The petitioner then testified consistently with his testimony at the suppression hearing, regarding what transpired on July 22, 2010, when he was arrested by the police and his cell phone was confiscated. The petitioner explained that he had purchased the cell phone "off the street" a week before his arrest after he lost his old phone when he fell asleep on the bus one morning. The petitioner stated that he ran into Williams near Long Avenue and Lake Street, whereupon Williams offered to sell him a "burn out" cell phone for $20. The petitioner described Williams as 150 lbs.,

an inch taller than him, with braids and a lighter complexion.

¶ 30    The petitioner's brother, Smith, testified consistently with the petitioner. He stated that at about 6 or 6:30 a.m., on July 7, and July 8, 2010, he was at his aunt's house, with his brother. Together with the petitioner he took his aunt's children to school whereupon the two of them returned home at around 10 or 10:30 a.m. According to Smith, the petitioner then went to sleep, while he played video games at the foot of the petitioner's bed, until waking him up at 6:30 or 7 p.m. so that the petitioner could go to work. Smith also testified that he was with his brother near the Green line station at Long Avenue when the petitioner bought his cell phone "off the street." Smith denied that he and the petitioner were on their way to a cell phone store to purchase a phone and instead claimed that they were on their way to pick up their cousins from school when they ran into "a guy who was selling a cell phone." According to Smith, the petitioner purchased the cell phone for $50.

¶ 31    On cross-examination, Smith acknowledged that he never shared any of this information with the police and that instead he only told the public defender.

¶ 32    In rebuttal, the State recalled Sergeant McGovern who testified to several inculpatory statements made by the petitioner upon his arrest. Sergeant McGovern averred that prior to each interview the petitioner was *Mirandized* and agreed to speak with the police. According to Sergeant McGovern, while the petitioner consistently denied committing any robberies, he told the police that he purchased a cell phone about three weeks prior to his arrest but then lost it running for the bus. Three days prior to his arrest, a female friend had called his cell phone number and spoke with an unidentified male who indicated that he would return the petitioner's cell phone to him for $20. The petitioner stated that he met with this individual, paid the money, and retrieved his cell phone. When confronted with the fact that Morrison identified him as the robber from the lineup,

9

the petitioner told the sergeant that he had seen a robbery and asked how he could stop someone who had a gun.

¶ 33    Sergeant McGovern further testified that during his second interview with the petitioner, which was held in the presence of Assistant State's Attorney (ASA) Patrick Waller, the petitioner stated that he had lost his cell phone three weeks prior to his arrest and had reacquired it only three days before. The petitioner once again indicated that he was "out there" when the robbery occurred but did not have a gun, did not rob anyone and was not involved. When asked to elaborate, the petitioner stated that he was with some friends on Long Avenue, and that they asked to use his cell phone to call and rob a delivery driver. The petitioner told police, however, that he did not know why they wanted to use his phone before he handed it over to them. The petitioner refused to identify any of his friends to the sergeant or the ASA.

¶ 34    On cross-examination, Sergeant McGovern acknowledged that the petitioner's statements were not memorialized either in writing or by way of an audio or video recording.

¶ 35    In rebuttal, the State also offered certified copies of the petitioner's two prior convictions, including possession of a controlled substance (from 2007) and attempt armed robbery (from 2005).

¶ 36    The defense sought to respond to the State's rebuttal by recalling the petitioner so that he could explain any prior inconsistent statements that he had made to the police, but the circuit court denied that request.

¶ 37    After hearing the parties' closing arguments, the jury acquitted the petitioner of attempt first degree murder but found him guilty of armed robbery and aggravated battery with a firearm. The circuit court subsequently sentenced the petitioner to a total of 46 years' imprisonment.

¶ 38    On appeal, the petitioner challenged his conviction, *inter alia*, on the grounds that his arrest

was achieved by the use of unauthorized surveillance technology to which several police officers had testified without a proper foundation at the hearing on his motion to quash arrest and suppress evidence. See *People v. Smith*, 2017 IL App (1st) 141814-U (*Smith I*). We agreed and reversed the petitioner's conviction, finding that his trial counsel was ineffective for failing to challenge the lack of any expert testimony to lay the foundation for the clandestine and unauthorized surveillance technology used. *Id*. We therefore remanded the matter to the circuit court for a new suppression hearing. *Id*. After the State appealed, our supreme court directed us to vacate the reversal of the petitioner's conviction, and retain jurisdiction over the proceedings, but nonetheless remand the matter to the circuit court for the appointment of new counsel, an opportunity to file an amended motion to quash arrest and suppress evidence, and a new hearing on the original or amended motion, in front of a new judge. *Smith II*, 2017 IL App (1st) 141814-UB.

¶ 39    On remand, the petitioner filed, and the State did not oppose, an amended motion to quash arrest and suppress evidence. On July 19, 2019, the circuit court entered an agreed order suppressing the evidence obtained as a result of the petitioner's July 22, 2010, arrest. The court then vacated the petitioner's convictions for armed robbery and aggravated battery with a firearm and dismissed the remaining counts that had been *nolle prossed* in the original proceedings.

¶ 40    On July 6, 2021, the petitioner filed the instant petition for a certificate of innocence pursuant to section 2-702 of the Code (735 ILCS 5/2-702 (West 2018)). In support, he attached the appellate court decision from his direct appeal, the July 19, 2019, agreed order vacating his convictions and dismissing all other charges against him, and a transcript of the proceedings held on that date.

¶ 41    On January 13, 2022, the State filed its written objection. The State conceded that the petition had satisfied two of the four elements required to obtain a certificate of innocence but

11

argued that it failed to establish by a preponderance of the evidence that the petitioner was innocent of the offenses charged in the indictment and that it was not his own voluntary conduct that caused or brought about his convictions. See 735 ILCS 5/2-702 (West 2018). The State also asserted that the dismissal of the charges was not based upon a lack of evidence but rather on the lack of admissible evidence. In support, the Sate asked the circuit court to take judicial notice of the trial evidence and in support attached transcripts of both the pretrial and trial proceedings.

¶ 42    After the petitioner filed his response to the State's objection, on April 5, 2022, the circuit court held a hearing on the petition. Only one witness, the petitioner, testified at that hearing.

¶ 43    The petitioner stated that he was 35 years old and that as a result of the instant convictions, he was incarcerated (either in jail or in the state penitentiary) between July 22, 2010, and August 9, 2019. The petitioner averred that he was presently employed as a general manager at McAlister's Deli in Springfield, Illinois, and that he had worked there for three months.

¶ 44    The petitioner next testified regarding the events leading up to his convictions. He stated that on July 7 and July 8, 2010, he was 23 years old and lived with his father, Charles Johnson, at 30 South 21st Avenue in Maywood, Illinois. The petitioner worked as a night manager at the McDonald's restaurant located on the corner of Karlov Avenue and Madison Street in Chicago. His shift was from 10 p.m. to 6 a.m. on most days.

¶ 45    On the morning of July 7, 2010, the petitioner left work at about 6:15 a.m. and took a bus to his aunt's house at 5837 South Washington Boulevard. The petitioner testified that he followed the same routine every day. He would arrive at his aunt's home around 7 a.m. where either his aunt or his uncle opened the door for him. He explained that both his aunt and uncle were certified nursing assistants, so they usually met him at the front door before they left for work.

¶ 46    The petitioner averred that there were usually many people inside the house, including his

mother, his three younger cousins, and his brother, Smith. The petitioner stated that on July 7, 2010, together with Smith, he walked one of his cousins, Kenisha, to school. Afterwards, he and Smith may have stopped by a store to get some snacks, but then returned home to eat, hang out, and play video games, which they usually did, before the petitioner went to sleep. The petitioner always set his alarm clock for 8 p.m., so that he could get dressed and be punctual for the start of his shift at McDonald's at 10 p.m. On July 7, 2010, the petitioner woke up at 8 p.m. and went to work at 10 p.m. until the following day. He stated that his routine on July 8, 2010, was the same.

¶ 47 The petitioner next testified that in July 2010, he did not wear "braids" or "dreads," but rather wore his hair "cut low," in a "fade cut," about "an inch and a half" long. The petitioner identified photographs of himself showing how he looked in July 2010. The petitioner's hair was not in braids or dreads in either photograph.

¶ 48 The petitioner also described his skin color as brown, maybe medium, not light. In addition, he stated that on July 7 and July 8, 2020, he had tattoos on his arms, and on the front of his right hand and on his wrist. Photographs of those tattoos were admitted into evidence and the petitioner displayed them in court.

¶ 49 The petitioner denied robbing either Don or Morrison. He stated that he had never met either man prior to his trial.

¶ 50 The petitioner next testified that he bought the cell phone that was confiscated from him upon his arrest, from Williams, who he knew from high school. The petitioner explained that Williams was a few years younger than him, had a lighter skin tone, and wore his hair in braids. Williams lived at 221 North Long Avenue, in Chicago, which is the location of one of the robberies the petitioner was accused of committing.

¶ 51 The petitioner stated that sometime after July 7 or July 8 but before he was arrested on July

22, 2010, he lost his cell phone on the bus. The petitioner needed a new phone and had unsuccessfully visited a store on Laramie Avenue and Lake Street, which he believed was having a "super deal" and offering "prepaid account" or "burner" phones for $20 to $30, when he ran into Williams. After catching up, the petitioner told Williams what he was after, and Williams offered to sell him a cell phone. The two first haggled over the price but the petitioner told Williams that he only had $20, so Williams agreed. The petitioner admitted that this was the phone that was on his person when he was arrested. The petitioner claimed that his brother, Smith, was present during this transaction.

¶ 52    The petitioner acknowledged that after being arrested he was questioned by police detectives at the police station. The petitioner stated that he was handcuffed and that prior to being questioned, the police never advised him of his *Miranda* rights, nor offered to memorialize any of his statement in writing, or by way of audio or video recording.

¶ 53    The petitioner told the detectives that he lost his old phone and purchased the one that was on his person "maybe a few days prior" to that. When the detectives asked the petitioner to identify the person from whom he bought the phone, the petitioner stated that he did not "want to tell on [his] friend." The petitioner denied that he ever told the detectives that a person telephoned him and said that he would return the petitioner's lost phone for $20.

¶ 54    The petitioner further averred that he told the detectives "a million times" that he did not rob either Morrison or Don. The petitioner informed them that the only robbery he was ever involved in was in 2006, for which he had already been convicted for attempt armed robbery. The petitioner explained that this incident had involved another person holding a gun and asked the detectives, "how are you supposed to stop somebody that has a gun."

¶ 55    The petitioner acknowledged that he was subsequently questioned a second time in the

14

presence of an ASA and claimed that he gave the ASA the same answers he had previously given to the detectives.

¶ 56    On cross-examination, the petitioner admitted that he had reviewed the transcripts from his trial "tirelessly" both during his incarceration and after his release. He acknowledged that unlike his current testimony, at trial he had stated that it was his brother, rather than his aunt or uncle, who had opened the door for him at his aunt's house on July 7 and July 8. The petitioner, however, explained that he could not recall exactly who was there to open the door on the days in question because it had been over 15 years since his arrest. He averred that he would sometimes catch his aunt and uncle and sometimes not.

¶ 57    After the petitioner's testimony, at the request of both parties, the court admitted into evidence the transcripts from the petitioners' criminal proceedings.

¶ 58    Following closing arguments, the circuit court took the matter under advisement so it could "review the entirety of the trial proceedings."

¶ 59    On September 16, 2022, the circuit court denied the petition for a certificate of innocence on the basis that the petitioner failed to establish by a preponderance of the evidence that he was innocent of the crimes charged. In doing so, the trial judge noted that it was being asked to weigh the identification testimony of Don and Morrison with the alibi evidence offered by the petitioner and his brother. After having considered the petitioner's new testimony, the photographic exhibits he offered at the hearing on his petition, and the judicially noticed transcripts from the original trial proceedings, the judge first discounted Don's identification because his initial description of the robber was of a light-skinned individual with braids, and because he was questioned without a professional interpreter. As the court explained: "while [Don] was adamant that it was the petitioner, the words used to describe the petitioner called into question clearly whether he had in

fact identified the person who was his attacker." The court next considered Morrison's identification of the petitioner as the robber and found that it outweighed any evidence of the petitioner's innocence. As the court explained:

"But I considered also the description of the actual victim in the case. I considered the time that he had to observe, the circumstances under which he observed, that even after being shot, he had the presence of mind to get himself to the hospital. I considered that his past included serving in the military. There was testimony of him being a veteran."

The court ultimately concluded that based on the "sum of *** all the evidence" it had heard, "the petitioner failed to establish by a preponderance of the evidence that he in fact [was] actually innocent in this case." The petitioner now appeals.

¶ 60                                    II. ANALYSIS

¶ 61    On appeal, the petitioner contends that the circuit court erred in denying his petition for a certificate of innocence. For the following reasons, we disagree.

¶ 62    Pursuant to section 2-702(b) of the Code, any person convicted and subsequently imprisoned in Illinois for one or more felonies, "may under the conditions hereinafter provided, file a petition for certificate of innocence in the circuit court ***." 735 ILCS 5/2-702(b) (West 2018). Section 2-702(g) further provides that to obtain a certificate of innocence, the petitioner must prove the following four statutory requirements by a preponderance of the evidence:

"(1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

(2)(A) the judgment of conviction was reversed or vacated, and the indictment or

information dismissed ***;

> (3) the petitioner is innocent of the offenses charged in the indictment or information ***; and

> (4) the petitioner did not by his *** own conduct voluntarily cause or bring about his *** conviction." 735 ILCS 5/2-702(g) (West 2018).

"If the court finds that the petitioner is entitled to a judgment, it shall enter a certificate of innocence finding that the petitioner was innocent of all offenses for which he *** was incarcerated." 735 ILCS 5/2-702(h) (West 2018).

¶ 63    This statute provides a means to obtain a finding of innocence so that the petitioner may obtain relief against the State for wrongful incarceration through the court of claims. See 735 ILCS 5/2-702(a) (West 2018); *People v. Hood*, 2021 IL App (1st) 162964, ¶ 22 (citing *Rodriguez v. Cook County, Illinois*, 664 F. 3d 627, 630 (7th Cir. 2011); see also and *Betts v. United States*, 10 F. 3d 1278, 1283 (7th Cir. 1993) ("[a] certificate of innocence serves no purpose other than to permit its bearer to sue the government for damages.") Where a petitioner obtains a certificate of innocence, it is "all but certain that the petitioner can obtain a money judgment against the State for wrongful incarceration." *People v. Moore*, 2020 IL App (1st) 190435, ¶ 37.

¶ 64    In any hearing on such a petition, the circuit court "must consider the [supporting] materials attached to the petition" (*Hood*, 2021 IL App (1st)  162964, ¶ 23) and "may take judicial notice of prior sworn testimony or evidence admitted in the criminal proceedings which resulted in the alleged wrongful incarceration" (735 ILCS 5/702(f) (West 2018)). The proceedings are civil in nature, and the burden is on the petitioner to prove the requirements to entitle him to such relief by a preponderance of the evidence. *People v. Rodriguez*, 2021 IL App (1st) 200173, ¶ 44. As the trier of fact, the circuit court is then obliged "to weigh the evidence presented[] and determine

17

whether the petitioner has met" his burden of proof with respect to all four elements. *Rodriguez*, 2021 IL App (1st) 200173, ¶ 45. In this role, the circuit must "exercise[e] its discretion *** regarding the weight and admissibility of evidence submitted" by the parties. 735 ILCS 5/2-702(a) (West 2018).

¶ 65    In the present case, the parties agree that the petitioner has met three of the four elements required to obtain a certificate of innocence under section 2-702(g). 735 ILCS 5/2-702(g) (West 2018). Their only disagreement involves subsection (g)(3), namely, whether the petitioner proved by a preponderance of the evidence that he is "innocent of the offenses charged in the indictment or information." *Id.*

¶ 66    At the outset, the parties dispute the appropriate standard of review. The petitioner seeks review under the manifest weight of the evidence standard, while the State urges us to examine the circuit court's decision for an abuse of discretion.

¶ 67    We recognize that currently there is a split in authority regarding which standard of review applies to certificate of innocence determinations. See *People v. Washington*, 2023 IL 127952, ¶ 47 (noting the split in authority on the standard of review question but declining to address it). While the majority of our appellate decisions agree that the determination of whether a petitioner is entitled to a certificate of innocence is to be reviewed for an abuse of discretion (see *Rodriguez*, 2021 IL App (1st) 200173, ¶ 44 (collecting cases)), one panel of this court has recently held that because this determination requires the circuit court to evaluate factual evidence, "the appropriate standard of appellate review" is "manifest weight of the evidence" (see *People v. McIntosh*, 2021 IL App (1st) 171708, ¶ 40 ).

¶ 68    Nonetheless, both abuse of discretion and manifest weight of the evidence are deferential standards of review. See *People v. Terrell*, 2022 IL App (1st) 192184, ¶ 51. "A trial court abuses

its discretion only when its ruling is arbitrary, fanciful or unreasonable or where no reasonable person would take the view adopted by the trial court." *Rodriguez*, 2021 IL App (1st) 200173, ¶ 47. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence. *People v. Banks*, 2020 IL App (2d) 180509, ¶ 25. Accordingly, while we would agree with the rationale of the majority of the courts, which review certificate of innocence findings for an abuse of discretion, we would reach the same result under either standard of review. 735 ILCS 5/2-702(g)(3) (West 2018).

¶ 69    Turning to the merits, for the following reasons, we find that the petitioner has failed to establish by a preponderance of the evidence that he was innocent of the charged offenses, and that the circuit court therefore properly denied his petition for a certificate of innocence.

¶ 70    "A proposition is proved by a preponderance of the evidence when the proposition is more probably true than not true." *People v. Love*, 404 Ill. App. 3d 784, 787 (2010). As already noted above, "[i]nherent in [certificate of innocence] proceedings, a trial judge must consider and weigh the evidence presented, *** to determine if the petitioner has met [his burden of proof.]" *Rodriguez*, 2021 IL App (1st) 200173, ¶ 44.

¶ 71    In the present case, the circuit court properly considered the transcripts of the petitioner's trial, which were judicially noticed at the request of both parties. See 735 ILCS 5/2-702(f) (West 2018) (allowing the circuit court to take "judicial notice of prior sworn testimony or evidence admitted in the criminal proceeding.") It then weighed the sworn trial testimonies of Morrison and Don against those of the petitioner and Smith, as well as the petitioner's subsequent testimony at the hearing on the certificate of innocence and found that Morrison's identification outweighed the petitioner's alibi claim. After a review of the record, we find nothing arbitrary,

fanciful, or unreasonable in this conclusion. *Rodriguez*, 2021 IL App (1st) 200173, ¶ 47.

¶ 72    At the petitioner's trial, Morrison unequivocally identified the petitioner as his assailant. He testified that on the afternoon of July 8, 2010, he was dispatched to 310 North Long Street to deliver a pizza. Once there, he called the number with which the order had been placed. After hearing the phone ring, he observed the petitioner from inside the building as they spoke, after which the petitioner indicated that he was coming out. Standing outside of his vehicle, Morrison then saw the petitioner exit the building and approach him. When the petitioner reached the car, Morrison asked him if he wanted the pizza and the petitioner responded in the affirmative and asked, "How much is it?" Morrison leaned into his car to retrieve the receipt. When he turned around to face the petitioner, the petitioner "was up on [him] with a gun to [his] chest." When Morrison tried to push the gun away with his hand, it went off striking him in the stomach. Morrison then asked the petitioner why he had shot him. The petitioner instructed Morrison not to move, leaned into him, pushed him against the car, and took $20 out of his pocket before walking away. Morrison testified that he was looking at the petitioner directly during the encounter and that it "seemed like slow motion to him."

¶ 73    Morrison further testified that two weeks after the incident, he identified the petitioner as his assailant in a police lineup. When asked whether he "expected to see the person that robbed [him]" in the lineup, Morrison explained that he had been in lineups. It ain't [certain] I'm going to see him, but I did." Morrison identified the petitioner as his assailant a second time at trial.

¶ 74    In contrast, the petitioner, supported by Smith's sworn trial testimony, claimed that he was at his aunt's house during the robbery, and that he obtained the cell phone, which was used in the robbery, after the fact. The petitioner's changing versions of the events, however, were fraught with inconsistencies. For example, transcripts from the petitioner's trial established that

the petitioner initially told police that he obtained the cell phone used in the robberies three weeks prior to the robbery but then lost it running for the bus and subsequently retrieved it when his female friend called his cell phone number and learned from an unidentified man, who answered, that the petitioner could retrieve his phone if he paid $20. The petitioner next told police that he was "out there" when the robbery occurred but did not have a gun, did not rob anyone and was not involved. When asked to elaborate, the petitioner told the police that he was with some friends on Long Avenue, and that they asked to use his cell phone to call and rob a delivery driver. The petitioner stated, however, that he did not know why they wanted to use his cell phone before he handed it over to them. He then refused to name his friends. At the suppression hearing and subsequently at trial, however, the petitioner claimed for the first time that he purchased the phone "off the street" from a high school friend, Williams, a week before his arrest, because he had lost his old phone when he fell asleep on the bus one morning. At the hearing on the certificate of innocence, he further elaborated on this purchase from Williams, explaining that he ran into Williams after being unable to find a burner phone "on sale" at a local store, and that he purchased the phone from Williams for $20. This claim, however, was contradicted by his brother's sworn account at trial, according to which he and the petitioner were not headed to a store to buy a phone but instead ran into "a guy selling a cell phone" on their way to pick up their cousins from school, whereupon the petitioner purchased the phone for $50.

¶ 75    Taking these contradictions in the petitioner's varied versions of the events leading up to his arrest into account and weighing them against Morrison's unequivocal identification, a reasonable trier of fact could have found that the petitioner failed in his burden to establish by a preponderance of the evidence that he was not present for the robbery, nor in possession of the

21

cell phone when that robbery occurred and was therefore not innocent of the charged crimes. Accordingly, under this record, we are unable to conclude that the circuit court's denial of the petitioner's certificate of innocence was either arbitrary, fanciful, or unreasonable, or that the opposite conclusion was clearly apparent. *Rodriguez*, 2021 IL App (1st) 200173, ¶ 47; *Banks*, 2020 IL App (2d) 180509, ¶ 25.

¶ 76    The petitioner nonetheless asserts that the circuit court's finding was erroneous because Morrison's identification was "suspect" in light of the "recent science of the psychology of mistaken identity." In support, the petitioner cites three studies on factors that may influence eyewitness identification testimony, including viewing time, stress, and weapon-focus.

¶ 77    The petitioner, however, never raised this argument in the circuit court. Nor did he attach any of these scientific studies to his petition or offer them into evidence at his certificate of innocent hearing. The petitioner also never called any expert witnesses, who could have testified about these scientific studies or other problems that may be inherent in eyewitness identification. Accordingly, the scientific studies are not properly before this court, and we may not consider any argument premised on their findings. *In re R. M.*, 2022 IL App (4th) 210426, ¶ 46 (holding that scientific articles not presented to or considered by the trial court may not be considered on appeal); see also *People v. Pursley*, 2022 IL App (2nd) 210558, ¶ 68 ("Arguments not raised before the trial court are generally forfeited on appeal.").

¶ 78    To the extent that the petitioner challenges the reliability of Morrison's identification solely on the basis of the evidence presented at the hearing on the certificate of innocence, we find that any such claim is belied by the record.

¶ 79    First, contrary to the petitioner's position, Morrison did not view the petitioner for only a few seconds. While it is true that Morrison testified that the entire encounter from when he

turned to get the receipt to when he was shot lasted a few seconds, that encounter was not the only opportunity Morrison had to view the petitioner. Instead, Morrison testified that when he first arrived at the address in broad daylight, he telephoned the number from which the order was made and observed the petitioner speaking to him through an open window inside the building. He then observed the petitioner exit the building and approach his car before they spoke. After turning around to get the receipt, Morrison observed the petitioner from close up in the few seconds it took the petitioner to point the gun at him and shoot. Morrison, however, was adamant that those few seconds seemed like "slow motion." What is more, after he was shot, Morrison continued to observe the petitioner face to face as the petitioner ordered him not to move, pushed him back into the car, leaned in and took $20 from his pocket, before walking away.

¶ 80    Second, contrary to the petitioner's contention, Morrison's original description of the offender as a "light-skinned" African American, and his failure to mention the petitioner's tattoos, do not undercut the reliability of his identification. The perception of the petitioner's skin color as light-skinned rather than of medium complexion, as he described himself, was entirely subjective, particularly where the petitioner never introduced a photograph of the alternative suspect, Williams, at either his trial or the hearing on his certificate of innocence. Similarly, since Morrison was never asked about tattoos, his failure to mention them in his original description to the police has no bearing on the reliability of his subsequent identification of the petitioner as the offender. In fact, it supports his claim that throughout the encounter he was looking at his attacker's face.

¶ 81    Accordingly, for these reasons, we find nothing erroneous in the circuit court's finding that after having "considered the time that [Morrison] had to observe, the circumstances under which he observed, [and] that even after being shot, he had the presence of mind to get himself to

23

the hospital," Morrison's identification was reliable and outweighed any evidence offered by the petitioner in support of his certificate of innocence.

¶ 82   The petitioner nonetheless asserts that in coming to this conclusion the circuit court improperly made credibility determinations regarding Morrison's testimony, which came into evidence at the certificate of innocence hearing solely by way of judicially noticed transcripts from the petitioner's original trial. In support, the petitioner cites *Washington*, 2023 IL 127952. For the following reasons, we disagree and find that case inapposite.

¶ 83   In *Washington*, 2023 IL 127952, ¶ 1, the petitioner was initially charged with armed robbery and murder. After a trial resulted in a hung jury, the petitioner pleaded guilty to first degree murder in exchange for a 25-year sentence *Id*. ¶ 3. After the petitioner served his sentence, his conviction was reversed and the charges against him were dismissed as a result of allegations that police officers coerced and tortured him into signing a prewritten statement falsely confessing to the murder. *Id*. ¶¶ 1, 5. The petitioner subsequently sought a certificate of innocence. *Id*. The State did not participate in the hearing or offer any evidence to rebut the petition. *Id*. ¶ 21. After considering the petitioner's evidence, the circuit court requested "extra[-]record materials from the underlying criminal proceedings," including transcripts from the petitioner's suppression hearing and trial, to which the petitioner objected. *Id*. After *sua sponte* taking judicial notice of those records, the circuit court denied the petitioner's request for a certificate of innocence. *Id*. ¶¶ 22, 55. The appellate court subsequently affirmed, holding that the petitioner had failed to establish by a preponderance of the evidence the fourth statutory factor, *i.e*., that he did not cause or bring about his conviction by pleading guilty to the charged crime. *Id*. ¶ 22.

¶ 84   On appeal, our supreme court was tasked with determining the effect a petitioner's guilty

plea has on his petition for a certificate of innocence. *Id.* ¶ 22. Specifically, the court addressed whether a guilty plea by an innocent petitioner categorially prohibits the issuance of a certificate of innocence and, if not, whether the petitioner's guilty plea in this case had established that he voluntarily caused or brought about his own conviction such that he was prohibited from obtaining an innocence certificate. *Id.* ¶ 62. Our supreme court reversed the appellate court decision, finding that petitioners who pleaded guilty to crimes were not categorically barred from seeking certificates of innocence and that the petitioner in that case was entitled to such a certificate. *Id.* ¶¶ 36, 55. The court reasoned that "in light of the State's absence as an adversary in the proceedings below," the petitioner's "unrebutted and compelling evidence of police coercion that resulted in him confessing to a crime he did not commit and subsequently agreeing to plead guilty," was not in any way "contradicted, inherently improbable or impeached." *Id.* ¶ 55.

¶ 85    In doing so, our supreme court held that in rejecting the petitioner's contention that his statement to the police had been coerced, the circuit court had erred in *sua sponte* obtaining and relying on the transcripts from the petitioner's underlying criminal proceedings to question the petitioner's credibility. *Id.* ¶ 55. In that respect, our supreme court noted that the State had failed to participate in the certificate of innocence proceedings both in the trial and appellate courts, and that the petitioner never submitted any transcripts from his criminal proceedings in support of his certificate. *Id.* ¶¶ 21, 54. Our supreme court further observed that the State itself conceded on appeal that the circuit court had erred in relying on those transcripts over the petitioner's objection, and without affording him an opportunity to respond to their substance. *Id.* ¶ 55. Accordingly, our supreme court held that the circuit court improperly used its authority under the certificate of innocence statute to assess the petitioner's credibility. *Id.* ¶ 52. As the court stated,

while the statute permitted the circuit court to take judicial notice of the factual assertions presented in the transcripts of the underlying proceedings, it did not permit the circuit court to make credibility findings based on the matters of which it took judicial notice. *Id.* ¶ 53.

¶ 86    Unlike in *Washington*, in the present case, the State opposed the petitioner's request for a certificate of innocence in the circuit court and both the petitioner and the State offered the transcripts from the petitioner's underlying criminal proceedings into evidence at the certificate of innocence hearing. Both parties then asked the circuit court to consider the sworn testimony form those judicially noticed transcripts, with the petitioner relying on the alibi provided by his brother and the State relying on Morrison's identification of the petitioner as the person who robbed and shot him. The circuit court was therefore required to consider those materials and the factual assertions in the sworn testimony of the trial witnesses, and then weigh them against the remaining evidence introduced at the certificate of innocence hearing. *Rodriguez*, 2021 IL App (1st) 200173, ¶ 45 (In a certificate of innocence proceeding, the circuit court is obligated to "weigh the evidence presented[] and determine whether the petitioner has met" his burden of proof.); see also *People v. Fields*, 2011 IL App (1st) 100169, ¶ 19 (when "determining whether [a petitioner] showed by a preponderance of the evidence that he was innocent" of the charged crimes "the [circuit] court was required to consider" the evidence supporting "his innocence claim *** in relation to the trial evidence presented against" him at his criminal trial; failure to do so constituted error). The circuit court did just that, after which it concluded that the petitioner's evidence fell short of establishing by a preponderance of the evidence that he was innocent of the charged crimes. Accordingly, *Washington* does not apply.

¶ 87    For the aforementioned reasons, we affirm the circuit court's order denying the petition

for a certificate of innocence.

¶ 88     Affirmed.